[No. 62227-2.  En Banc.  March 28, 1996.]

ORGANIZATION TO PRESERVE AGRICULTURAL LANDS, *Appellant*, v. ADAMS COUNTY, ET AL., *Respondents*.

*Bricklin & Gendler*, by *Michael W. Gendler* and *David S. Mann*, for appellant.

*Buck & Gordon*, by *Peter L. Buck* and *Jay P. Derr; David M. Sandhaus, Prosecuting Attorney for Adams County*, and *Gayle M. Petrusic, Deputy*; and *Davis Wright Tremaine*, by *Stephen M. Rummage* and *William K. Rasmussen*, for respondents.

*Monica M. Kirk* on behalf of Government Accountability Project, amicus curiae.

*Paul J. Lawrence* and *Brian K. Knox* on behalf of Regional Disposal Company, amicus curiae.

PEKELIS, J.P.T.* — Organization to Preserve Agricultural Lands (OPAL), a nonprofit corporation, appeals a trial court judgment upholding Adams County's issuance of an Unclassified Use Permit (UUP) authorizing the use of a site in the county for a proposed regional landfill. The trial court concluded that the proposed project is "private," thus the accompanying environmental impact statement need not include consideration of offsite alternatives; that phased review is appropriate for the project and the

---

*Justice Rosselle Pekelis is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2a (amend. 38).

groundwater studies are adequate for this phase; that the participation of the three Adams County commissioners in the decision did not violate the appearance of fairness; that OPAL lacks standing to challenge the legality of "host fees" under development fee statutes; and that the UUP should not be invalidated based on alleged noncompliance with the Open Public Meetings Act, the public procurement statutes, or the county's solid waste management plan. We affirm.

In 1991, Waste Management of Washington, Inc. (Waste Management) submitted an application to Adams County for a UUP to use certain land in the county for a municipal solid waste landfill and recycling facility. The corporation contemplated that the landfill would receive waste from throughout the Pacific Northwest, including Washington, Idaho, Montana, and Canada. A 340-page draft environmental impact statement (EIS) on the proposal was prepared by Waste Management's consultants and issued by the county in 1992. The county issued a final EIS in 1993.

While they were processing Waste Management's UUP application, the county commissioners were also engaged in the legislative task of developing a comprehensive solid waste management plan (SWMP). The county held hearings and received comments in the planning process from both OPAL members and Waste Management representatives. Waste Management believed that inclusion of a regional landfill option in the SWMP was important because it could negatively affect its ability to obtain an operating permit for the landfill project.

The Board of Commissioners held a series of public meetings on the UUP beginning on December 1, 1993. On January 24, 1994, the commissioners voted two to one (Commissioners Schlagel and Wills voting affirmatively; Commissioner Judd voting negatively) to approve Waste Management's application for a UUP, subject to the conditions contained in a "Mitigation Agreement."

OPAL filed a petition in Whitman County Superior Court to set aside the commissioners' decision granting the UUP. OPAL moved for summary judgment, arguing that the EIS was inadequate as a matter of law for failing to discuss offsite alternatives to the proposed landfill. The trial court denied the motion, concluding that OPAL had failed to establish the proposed landfill was a "public project" under *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 39-40, 873 P.2d 498 (1994).

Following a bench trial, the court affirmed the decision of the board granting the UUP and dismissed the writ with prejudice. OPAL appealed directly to this court and filed a motion on the merits to reverse, again on the issue of whether the EIS adequately discussed offsite alternatives. This court accepted review but denied appellant's motion on the merits to reverse.

## ISSUES

OPAL's appeal presents five issues regarding the validity of the issuance of the UUP by the Adams County Board of Commissioners: (1) is the accompanying EIS adequate, notwithstanding (a) the lack of consideration of offsite alternatives to the proposal and (b) the deferral of additional groundwater impact studies until the operating permit phase; (2) did the manner in which the commissioners decided to issue the UUP violate the Open Public Meetings Act; (3) did the commissioners violate the appearance of fairness by inadequate disclosure of ex parte contacts with the applicants, or by bias and prejudgment; (4) does the UUP comply with the Adams County solid waste management plan; and (5) was the UUP issued in exchange for "host fees" and other payments and services, in violation of both the public procurement law and statutory requirements for voluntary mitigation payments?

ANALYSIS

I

ADEQUACY OF ENVIRONMENTAL IMPACT STATEMENT

██ OPAL contends that the EIS is inadequate as a matter of law because it does not include consideration of offsite alternatives to the proposed landfill project and because the analysis of potential impact to groundwater contained in the EIS is inadequate to support the issuance of the UUP. The adequacy of an EIS is a question of law subject to de novo review. *Weyerhaeuser*, 124 Wn.2d at 37. At the same time, the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C.010-.914, provides that the decision of an agency regarding the adequacy of an EIS is to be "accorded substantial weight." RCW 43.21C.090. EIS adequacy involves the legal sufficiency of the data in the EIS. *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 633, 860 P.2d 390, *amended*, 866 P.2d 1256 (1993) (citing Richard L. Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* § 14(a)(i) (4th ed. 1993)). Sufficiency of the data is assessed under the "rule of reason," which requires a " 'reasonably thorough discussion of the significant aspects of the probable environmental consequences' of the agency's decision." *Weyerhaeuser*, 124 Wn.2d at 38 (citations omitted).

A. Failure To Consider Offsite Alternatives

OPAL first contends that the EIS is legally deficient because it does not include analysis of offsite alternatives. The EIS discussed three alternative proposals: a "no-action" proposal and two different configurations of a proposed landfill on the same site. It did not include discussion of offsite alternatives to the proposal.

██ SEPA requires that an EIS contain a detailed discussion of alternatives to the proposed action. RCW 43.21C.030(2)(c)(iii). SEPA's administrative rules provide that

an EIS must consider as alternatives those "actions that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation." WAC 197-11-440(5)(b).

Under current administrative rules and case law, whether an EIS must include consideration of offsite alternatives depends on whether the project is public or private. An EIS for a private project on a specific site need only consider a "no action alternative plus other reasonable alternatives for achieving the proposal's objective on the same site." WAC 197-11-440(5)(d); *Weyerhaeuser*, 124 Wn.2d at 39. A public-project EIS must also include a discussion of offsite alternatives to the proposal. *Weyerhaeuser*, 124 Wn.2d at 39.

To determine whether a project is public or private, we look first to who sponsored or initiated it because the administrative rules define a "private project" as "any proposal primarily initiated or sponsored by an individual or entity other than an agency." WAC 197-11-780. The classification rests not on nominal sponsorship but on a factual assessment of the level of public involvement in the project. *See Weyerhaeuser*, 124 Wn.2d at 39-40. In this case, we think it clear that the project was primarily sponsored and initiated by Waste Management, a private entity. Contrasting the facts of this case with those of *Weyerhaeuser* illuminates the private nature of the instant proposal. In *Weyerhaeuser*, the private corporation acted pursuant to a contract with the county when it sought to develop a new in-county landfill site, *id.* at 39; Waste Management has no such obligation to develop a landfill for Adams County.[1] In fact, Adams County has not yet formally decided to use the proposed facility to meet its

---

[1]OPAL argues that the project is public because Waste Management was required to develop an eastern Washington landfill in its contract with Seattle, and the project was thus initiated by a government entity, if not Adams County. OPAL does not, however, explain how the public involvement of another government entity makes the project public for purposes of Adams County's environmental analysis, when it has no authority regarding Seattle's waste disposal decisions.

own waste disposal needs. The private entity in *Weyerhaeuser* had a long-standing relationship with the county, including the county's involvement in the formation of the corporation to handle the county's entire solid waste system. *Id.* Waste Management currently is not involved in handling Adams County's solid wastes nor was the county involved in creating the corporation.

Alternatively, a project may be designated "public" because a government entity seeks to fulfill its responsibility to perform a traditional governmental function through the project. *See id.* at 40-41. For example, in *Weyerhaeuser,* we noted that a private company that had been given the job of operating the " 'whole Pierce County solid waste system . . .' " was performing a governmental function. *Id.* at 39 (citation omitted). Thus, even though it was a private company that applied for a conditional use permit to construct a new landfill, *id.* at 29, we held that the proposed project was "public" because its purpose was to fulfill the *County's* responsibility for the collection and disposal of solid waste, *see id.* at 40. This "governmental function" test ensures that a government agency cannot avoid the requirement of environmental consideration of alternative sites by simply contracting with a private entity to carry out its public duty. *See id.* at 41.

OPAL contends that *Weyerhaeuser* established a rule of law that an EIS for a landfill project must always include consideration of offsite alternatives. In so contending, OPAL misconstrues our "governmental function" analysis in that case. Our statement that "regardless of whether the County deals with a private company, the collection and disposal of solid waste is the County's responsibility," *id.* at 41, must be read in context. We were not creating a hard and fast rule that any activity relating to solid waste handling that takes place within a county constitutes a "public project" of that county, even where, as here, it does not even involve disposal of that county's own solid

waste. Rather, the key to the analysis is whether the governmental entity has, by means of the project at issue, allowed a private entity to fulfill the government's responsibility for handling the solid waste within its jurisdiction.

Under the "governmental function" analysis, we conclude that the proposed project is not one through which Adams County seeks to perform a traditional government function. Waste Management seeks to build a landfill to serve customers throughout the Pacific Northwest, including Washington, Idaho, Montana, and Canada. Adams County has no governmental responsibility for the solid wastes generated outside of the county, such that this project could be perceived as an attempt to contract with a private entity to fulfill that responsibility. Even were Adams County to decide to use the landfill for the wastes generated in the county, Waste Management estimated that Adams County's solid waste would constitute less than two percent of the anticipated annual volume of wastes disposed of at the facility.

In conclusion, we hold that Waste Management's proposed landfill project was properly characterized as "private," because it was primarily sponsored and initiated by a private entity and is not intended to fulfill the solid waste responsibilities of Adams County. As such, the EIS did not need to include a discussion of offsite alternatives to the proposed development.

## B. Adequacy of Groundwater Study

OPAL next argues that the analysis of potential groundwater impact is inadequate. Adams County responds that this proposal is appropriately evaluated in phases and that the analysis of the groundwater issue is sufficient for the siting phase of the permit process. As both parties seem to agree that further study will be required before an operating permit can be issued, we must first decide if "phased review" is appropriate. If so, we must then

analyze the contents of the EIS relating to groundwater impact and, under the "rule of reason," giving deference to the commissioners, determine whether it provided sufficient information for them to decide to issue the UUP.

The draft EIS was accompanied by a "draft geohydrological assessment report," which set forth preliminary analysis of the geology and hydrology of the site. Admin. R. at 1762-2408. The purpose of the report was to "determine the general physical conditions at the site." Admin. R. at 1774. The report acknowledged that after site approval, additional studies would be required to "obtain more specific data needed for the detailed design of the facility and its environmental controls." *Id.* The final EIS contained a summary of the draft geohydrological report, which concluded that "[b]efore a permit to operate the landfill will be granted, characterization of the flow path between the base of the landfill and the uppermost monitorable unit at the site, and design of an effective groundwater monitoring system that will identify leaks and provide opportunity for meaningful remediation would be required." Admin. R. at 2547 (emphasis added).

■ Although SEPA does not discuss the phasing of environmental review, administrative rules provide that review may be phased in some situations. WAC 197-11-060(5). The purpose of phasing review is to enable agencies and the public to focus on issues ripe for decision and to exclude from consideration issues that are not yet ready. *Klickitat*, 122 Wn.2d at 638 (citing WAC 197-11-060(5)(b)). Phased review is appropriate under the rules when "[t]he sequence is from an environmental document on a specific proposal at an early stage (such as need and site selection) to a subsequent environmental document at a later stage (such as sensitive design impacts)." WAC 197-11-060(5)(c)(ii). Phased review is not appropriate when "[i]t would segment and avoid present consideration of proposals and their impacts that are required to be evaluated in a single environmental document . . . ." WAC 197-11-060(5)(d)(iii). Proposals required to be evalu-

ated in one document are those "that are related to each other closely enough to be, in effect, a single course of action . . . ." WAC 197-11-060(3)(b). "Closely related" proposals are further defined as ones that are "interdependent parts of a larger proposal and depend on the larger proposal as their justification . . . ." WAC 197-11-060(3)(b)(ii).

■ Washington courts have approved phased review of environmental impacts in certain situations. For example, this court has approved a "bare bones" EIS that identified the potential impacts of an application for a rezone to allow for construction of residential units. *Cathcart-Maltby-Clearview Community Council v. Snohomish County*, 96 Wn.2d 201, 208-11, 634 P.2d 853 (1981). In *Cathcart*, we held that the EIS was adequate at this stage in that it identified potential impacts and provided a framework for further EIS preparation, reasoning that

> This project is an appropriate candidate for a piecemeal EIS presentation, for at this time it is extremely difficult to assess its full impact. Given the magnitude of the project, the length of time over which it will evolve, and the multiplicity of variables, staged EIS review appears to be an unavoidable necessity.

*Id.* at 210. An early-stage EIS is particularly appropriate when decisionmakers will have an opportunity to demand greater detail at a later project stage. Thus, in *Cathcart*, this court noted that "when the developers seek sector, division of development, and plat approvals, a more detailed EIS can be required." 96 Wn.2d at 209; *see also Ullock v. City of Bremerton*, 17 Wn. App. 573, 583, 565 P.2d 1179 (1977) (noting that the city would have to require a more detailed EIS at a later permit stage).

We conclude that this proposal presents an appropriate situation for phased review. The EIS at this phase focuses on the early issue of site selection. The EIS thus need only evaluate the proposed site's general suitability for a landfill—including potential groundwater impact—in or-

der to enable the county to decide whether or not to issue a UUP. Greater detail on the specific design of the landfill can be required at the next phase of the permitting process, when Waste Management must apply for construction and operation permits. The two phases (unclassified use and operating permit applications) are not interdependent; it would not be inconsistent for the county to decide that the site is appropriate for a landfill generally but that a particular design is unsatisfactory.

We also hold that the analysis of groundwater impact in the EIS is sufficient for this phase. After listening to expert testimony regarding the adequacy of this analysis, the trial court concluded that the assessment of hydrology and groundwater impacts is adequate. Even the one expert relied on by OPAL to support its argument that the analysis is inadequate, Larry Beard, did not testify definitively that the studies are inadequate for making the siting decision. Beard, who reviewed the geohydrological analysis, testified, "[I]f I can summarize our conclusions first with respect to the locational standards, and they do in fact appear to meet the basic locational standards . . . [s]o in terms of those minimum requirements, the site at this point, there appears to be enough information to draw those basic conclusions." Admin. R. at 8143. He also conveyed his understanding that further work could be done before an operations permit would be granted. Thus, we see no basis for overturning the determination by the commissioners.

## II

### VIOLATION OF OPEN PUBLIC MEETINGS ACT

OPAL next argues that the UUP should be invalidated because Commissioners Wills and Schlagel violated the Open Public Meetings Act, RCW 42.30.010-.920 (hereinafter the Act), by discussing Waste Management's proposal over the phone and agreeing how they would vote before the public meeting. The trial court found that "Commis-

sioners Wills and Schlagel had telephone conversations in January, 1994, prior to the public hearing at which the Board of Commissioners voted to issue the unclassified use permit" and that "[o]ne such conversation occurred the evening before the final public hearing, during which Commissioner Wills suggested that Commissioner Schlagel make a motion concerning the issuance of the permit." Clerk's Papers at 314 (finding of fact 20). Nevertheless, the court concluded that, even if the commissioners did discuss the substance of the UUP in private, the action to issue the UUP was valid because it took place at a proper open meeting.

■ Where, as here, the trial court has weighed the evidence, this court's review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law. *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). "Substantial evidence" exists when there is a sufficient quantum of proof to support the trial court's findings of fact. *In re Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

OPAL assigns error to the trial court's finding of fact regarding the phone conversation, apparently arguing that the finding should go further and recognize ex parte lobbying of Schlagel by Wills culminating in the making of a secret agreement during the phone call. Wills testified that on the night before the hearing, he called Schlagel and told him that the landfill proposal was on the next day's agenda and that Schlagel would have to make a motion. Schlagel, on the other hand, testified that he did not remember that phone call and adamantly denied that he had ever discussed with Commissioner Wills who would make a motion to issue the UUP. Commissioner Judd, however, suspected that the other two commissioners had reached an agreement about their vote on the UUP before the January 24 meeting. He testified that Commissioner Wills had told him that "he felt that the land use permit should go forward and he indicated to me that, his very

words were 'I'm going to lobby Schlagel on that issue.' "
Trial Tr. (Aug. 15-16, 1994) at 128. This speculation is not
sufficient to warrant overturning the trial court's finding
of fact. We thus conclude that the finding of the trial court
is supported by substantial evidence.

OPAL further contends that the trial court erred in its
conclusion that the ex parte communication between the
commissioners was irrelevant because the final vote oc-
curred in a proper, open public meeting. We agree with
the trial court.

█ The Act provides that any action taken at meeting
failing to comply with the open meeting requirements will
be null and void. RCW 42.30.060(1). Any "action" taken
during the phone call would thus be invalidated.[2] We are
persuaded that the statute does not, however, require that
subsequent actions taken in compliance with the Act are
also invalidated. This interpretation is supported by a
1971 Attorney General opinion cited by both parties
regarding the effect of action taken in violation of the act:

> if the final action taken by the public agency is in accordance
> with our open public meetings act requirements, then it
> would appear to us that this action would be defensible even
> though there may have been a failure to comply with the act
> earlier during the governing body's preliminary consideration
> of the subject. For example, if the members of the governing
> body had held an earlier meeting to discuss a certain pro-
> posal without complying with the act, but did comply in con-
> nection with the meeting at which the actual adoption of the
> proposal took place, the final action thus taken would be
> defensible.

33 Op. Att'y Gen. 40 (1971).

---

[2]Adams County argues that "[d]iscussions short of 'action' do not give rise to
a violation" of the Act. Br of Resp't at 96 (citing *Schmitt v. Cape George Sewer
Dist. 1*, 61 Wn. App. 1, 7, 809 P.2d 217 (1991)). The Court of Appeals in *Schmitt*
concluded that "[a]lthough it appears that some discussion occurred . . . the
commissioners took no formal action at that meeting." 61 Wn. App. at 7. The
plain language of the statute does not support this distinction between action
and discussions short of action, as the definition of "action" includes "discus-
sion." *See* RCW 42.30.020(3).

OPAL nevertheless urges this court to invalidate the decision to issue the UUP, contending that the alleged violation of the Act was not cured by " 'independent, final action in the sunshine.' " Br. of Appellant at 21 (citations omitted). In support of its argument, OPAL directs the court to several cases in which Florida courts have so interpreted the Florida open meetings act. A perusal of the cited cases, however, reaffirms our conclusion that invalidation of the decision to issue the UUP is not warranted in this case. We are particularly persuaded by the Florida Supreme Court's decision in *Tolar v. School Bd.*, 398 So. 2d 427, 428 (Fla. 1981), in which the court held that invalidation of the otherwise proper formal action of a public body was not required merely because the subject matter of that formal action was previously discussed at a nonpublic meeting. In so holding, the court distinguished the case before it, in which the opposing party was given a full opportunity to express his views in a public meeting, from cases in which formal action is merely summary approval of decisions made in numerous and detailed secret meetings. *Id.* at 427-28. Given the extensive opportunity for input by opposing parties in this case, we agree with the trial court that invalidation of the UUP decision is not warranted merely because two of the commissioners discussed in private who should make the motion to issue the UUP.

## III

### APPEARANCE OF FAIRNESS

OPAL also contends that the commissioners' decision to issue the UUP should be invalidated because the process lacked the appearance of fairness. Specifically, OPAL argues that Commissioner Schlagel's initial disclosure of ex parte contacts was incomplete and did not satisfy the requirements of the appearance of fairness doctrine. Also, OPAL contends that Schlagel failed to disclose ex parte communication with a Waste Management representative

that occurred after the initial disclosure but while the permit decision was pending. OPAL further argues that participation in the decision by Commissioner Wills violated the appearance of fairness doctrine because he prejudged the decision and was biased in favor of Waste Management.

The trial court concluded that Commissioner Schlagel's initial disclosure statement was adequate, that OPAL waived its right to challenge its adequacy by not asking for more detail when the statement was made, and that none of Schlagel's subsequent ex parte communications involved "information or arguments that were not otherwise discussed as part of the public hearings process," so no further disclosure was required. Clerk's Papers at 319 (conclusion of law 27). As regards Commissioner Wills, the court found that he did not evidence a disqualifying bias or prejudice. Moreover, the court concluded that disqualification of Commissioner Wills for prejudgment would have compelled disqualification of Commissioner Judd, as both vehemently expressed their opinions and concerns regarding the merits of the proposed landfill. The court then concluded that, under retroactive application of the "rule of necessity," both commissioners could have participated and their initial decision would have been affirmed.

## A. Commissioner Schlagel

Each commissioner made an "appearance of fairness" statement at the beginning of the December 1, 1993, public hearing on Waste Management's UUP application. In his brief statement, Commissioner Schlagel specifically mentioned discussing the proposed location of the landfill with Norm Wietting (Waste Management's project manager) and Scott Cave (its Ritzville representative). He disclosed that he had "[a] couple of conversations with Scott Cave during my campaign about the landfill" and said that Cave once handed him a book on the draft EIS. Admin. R. at 10462. He concluded by saying that "I've

had several brief conversations with several people both for and against the landfill, and have had very few phone calls and letters." *Id.* No challenge was raised to participation by Commissioner Schlagel at that time.

At trial, Commissioner Schlagel admitted surprise when informed that records showed 63 long-distance phone calls from Waste Management to his home or office during the 13 months between his election and the December 1 hearing. He explained that it is difficult to avoid talking to people in small communities and that he did not "get together and hide out and try to make a big deal out of something like that." Trial Tr. (Aug. 15-16, 1994) at 66. When asked if he and Waste Management's Scott Cave met and talked about the permit, he replied, "mentioned it, maybe." *Id.* at 67.

OPAL bases its argument that Commissioner Schlagel's initial disclosure statement was inadequate primarily on a perceived discrepancy between Schlagel's description of "very few" phone conversations with opponents and proponents of the landfill and the record of phone calls between Waste Management and numbers associated with Schlagel.

Certain ex parte communications between a decision-maker and opponents or proponents of a proposal are prohibited and can provide a basis for invalidating a decision on the proposal. Under the appearance of fairness statute, "[d]uring the pendency of any quasi-judicial proceeding, no member of a decision-making body may engage in ex parte communications with opponents or proponents *with respect to the proposal* . . . ." RCW 42.36.060 (emphasis added). The statute specifically provides, however, that no decisionmaker will be disqualified "for conducting the business of his or her office with any constituent on any matter other than a quasi-judicial action then pending before the local legislative body," RCW 42.36.020, or for expressing an opinion on a pending or proposed quasi-judicial action while campaigning for public office, RCW 42.36.040.

■ OPAL has not demonstrated that the phone calls between Waste Management and Commissioner Schlagel involved communication "with respect to the proposal which is the subject of the proceeding," RCW 42.36.060, as opposed to some other legislative or administrative business. As the trial court found (and OPAL has not challenged), the commissioners were engaged in the *legislative* task of developing a solid waste management plan (SWMP) during the period in question. Waste Management had an interest in the inclusion of a regional landfill alternative in the SWMP because the lack of this alternative could negatively affect its ability to obtain an operating permit for the landfill. The company thus communicated its interest to the commissioners as part of the legislative process. Additionally, the trial court found that Waste Management had administrative reasons for communicating with the commissioners, such as issues arising from its obligation to pay for the county's costs associated with processing the UUP. Although OPAL challenges the trial court's findings that the commissioners had many ex parte contacts regarding policy issues and administrative matters, it offers no evidence to support its challenge. We conclude that the trial court's findings regarding communications between Waste Management and the commissioners are supported by substantial evidence and that OPAL has not established that any additional calls involved prohibited communications.

Nevertheless, OPAL contends that Commissioner Schlagel's initial disclosure statement was inadequate because he failed to provide details of the "substance" of his ex parte contacts. A decisionmaker who engages in prohibited ex parte communications can validly participate in a decision on the proposal only if he or she places on the record "the substance of any written or oral ex parte communications." RCW 42.36.060(1). We agree with the trial court that OPAL has waived its right to challenge Schlagel's participation on this basis. The statute provides that

[a]nyone seeking to rely on the appearance of fairness doc-

trine to disqualify a member of a decision-making body from participating in a decision must raise the challenge as soon as the basis for disqualification is made known to the individual. Where the basis is known or should reasonably have been known prior to the issuance of a decision and is not raised, it may not be relied on to invalidate a decision.

RCW 42.36.080. If OPAL believes that the content of Commissioner Schlagel's disclosure was inadequate on its face, then it reasonably should have known that when the disclosure statement was made. Because OPAL did not object to Schlagel's participation at that time or before the commissioners made the final decision to issue the UUP, it cannot now seek to disqualify him on that basis.

OPAL further contends that Commissioner Schlagel violated the appearance of fairness statute by engaging in ex parte communications relating to the proposal after his initial disclosure and not disclosing these communications at subsequent public hearings. It is undisputed that the commissioner had two telephone conversations with Waste Management's Scott Cave after his initial disclosure. Cave testified as follows regarding the substance of one of the conversations:

> I felt, the Spokesman Review had taken a very harsh editorial position against the company and, uh, again I deal with solid waste issues in the State for the company and I felt that the article was very damaging, and, uh, I thought it was very important that I contact an Adams County Commission [sic], at least one member, and explain the situation.

Trial Tr. (Aug. 15-16, 1994) at 110. The trial court concluded that these ex parte contacts did not invalidate the decision because they "did not involve the disclosure of information or arguments that were not otherwise discussed as part of the public hearings process." Clerk's Papers at 319 (conclusion of law 27).

The statute requires that a decisionmaker must provide that "a public announcement of the content of the communication and of the parties' rights to rebut the

substance of the communication shall be made at each hearing where action is considered or taken on the subject to which the communication related." RCW 42.36.060(2). Commissioner Schlagel should have made a public announcement about his ex parte conversations with Scott Cave at subsequent public meetings regarding the UUP. Nevertheless, the failure by Commissioner Schlagel to disclose was harmless and should not serve to invalidate the decision. The purpose of the disclosure requirement is to provide opposing parties with an opportunity to rebut the substance of any ex parte communications. *See* RCW 42.36.060(2). In this case, Cave apparently called Commissioner Schlagel to express his disagreement with a negative portrayal of Waste Management in two newspaper articles. At a subsequent public hearing, Greg Buckley of OPAL offered the two newspaper articles and testified that they "expose Waste Management for what they really are—convicted corporate felons." Admin. R. at 11294. Thus OPAL has, in effect, rebutted Cave's communication and the purpose of the statute would not be served by an invalidation of the decision now.

### B. Commissioner Wills

OPAL next argues that Commissioner Wills should have been disqualified under the appearance of fairness doctrine because of prejudgment and bias in favor of Waste Management. The trial court concluded that none of the commissioners evidenced a personal bias for or against a party, nor did anyone prejudge issues of fact before the commission.

██ Quasi-judicial hearings, such as the permit application hearings at issue in this case, must be conducted so as to give the appearance of fairness and impartiality. This court has stated that the appearance of fairness doctrine is satisfied "if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing." *Washington Med.*

*Disciplinary Bd. v. Johnston,* 99 Wn.2d 466, 478, 663 P.2d 457 (1983). A decisionmaker may be challenged under this doctrine for "prejudgment concerning issues of fact about parties in a particular case . . . [or] partiality evidencing a personal bias or personal prejudice signifying an attitude for or against a party as distinguished from issues of law or policy . . . ." *Buell v. City of Bremerton,* 80 Wn.2d 518, 524, 495 P.2d 1358 (1972). Prejudgment and bias are thus to be distinguished from the ideological or policy leanings of a decisionmaker. A challenger must present evidence of actual or potential bias to support an appearance of fairness claim. *State v. Post,* 118 Wn.2d 596, 619, 826 P.2d 172, *amended,* 837 P.2d 599 (1992).

In support of its claim of bias and prejudgment, OPAL offers that Wills urged the board not to do business with Dan Dietrich because he associated him with OPAL, attempted to fire a planning director responsible for a negative report on the permit application, and acted as Waste Management's and the board's "go-between." The record reveals ambiguous evidence regarding these claims. Thus, the trial court was within its discretion in determining that Wills was able to maintain an open mind about the merits of the proposal before him, notwithstanding his expressed policy preference for siting a regional landfill project in the county.

IV

COMPLIANCE WITH ADAMS COUNTY SOLID WASTE
MANAGEMENT PLAN

OPAL argues that the proposed landfill does not comply with the county's solid waste management plan (SWMP), as required by state statute and local ordinance. The basis for OPAL's argument is its assertion that the SWMP does not make specific recommendations for a private, regional landfill. The commissioners, however, found that the

county's plan does allow for siting a regional landfill in the county and that the proposed landfill is consistent with that plan.

The county first issued a draft "Adams County Comprehensive Solid Waste Management Plan 1992 Update" in February 1993. Admin. R. at 4462-4708. In its section on landfilling, the draft plan included discussion of a "regional landfill alternative." Admin. R. at 4558-64. The draft provided that this alternative "would allow development of a privately owned and operated regional landfill in Adams County." Admin. R. at 4558. Thereafter, the commissioners approved the transmittal of the draft plan to the Department of Ecology (DOE) for review and comment. DOE asked for a "specific recommendation to be made based on evaluation of the regional landfill versus continued use of Bruce or long haul." Admin. R. at 10331. In its letter approving the plan, DOE stated that its request was adequately addressed by the recommendation that operations would continue at the county landfill (Bruce), which would close if a regional facility is sited.

Even if this court accepts OPAL's argument that RCW 70.95.185 and Adams County Ordinance 17.72 require that a UUP for a landfill proposal may not be issued unless the proposal conforms to the county's SWMP,[3] OPAL has not met its burden of showing that the trial court's finding and conclusion were in error. Adams County's SWMP provides for a regional landfill alternative, specifically outlining siting policies and recommending certain requirements of any operator, should the county approve a private, regional landfill. Because the commissioners' finding is supported by substantial evidence and its conclusion is not contrary to law, OPAL's argument fails.

---

[3]As Respondent points out, RCW 70.95.185 appears to apply to applications to a jurisdictional health department for an operating permit, not to applications for an unclassified use permit. The Adams County Code provides only that "the county's comprehensive land use plan" is a "[f]actor[] to be considered" when the commissioners evaluate an application for a UUP. Adams County Code § 17.72.040.

## V

### LEGALITY OF BENEFITS TO ADAMS COUNTY CONTAINED IN MITIGATION AGREEMENT

OPAL next asks that we vacate the UUP because Adams County contracted with Waste Management to issue the UUP in exchange for promises of goods, services, and cash contained in the mitigation agreement (hereinafter "the Agreement") without meeting the requirements of Washington's public procurement statutes. Specifically, OPAL argues that the Agreement was negotiated in violation of RCW 36.32.245, which requires competitive bidding for contracts for the purchase of materials, equipment, or supplies, and RCW 36.58.090(2), which requires publication of requests for proposals to provide solid waste services. The trial court rejected this argument, concluding that competitive bidding is not required for the acquisition of free goods and services.

Washington's public procurement statute provides that "[n]o contract for the purchase of materials, equipment, or supplies may be entered into by the county legislative authority . . . until after bids have been submitted to the county." RCW 36.32.245. The selection of entities to "provide solid waste handling services" is exempted from competitive bidding requirements. RCW 36.32.265. Contracts for the provision of solid waste services are instead covered by RCW 36.58.090, which requires county commissioners seeking to contract for solid waste services to "publish notice of its requirements and request submission of qualifications statements or proposals."

In support of its assertion that the agreement is a contract, and thus subject to public procurement laws, OPAL first notes Commissioner Judd's testimony that "I'm frankly concerned that essentially what we did was sell a land use permit." Trial Tr. (Aug. 15-16, 1994) at 131. Second, OPAL points to the Agreement's inclusion of an

"offer" by Waste Management to dispose of all of the county's solid waste without charging a "tipping fee" and to pay for the cost of hauling the county's wastes from transfer stations to the landfill. Also, Waste Management agreed to "donate" a $40,000 community grant to Adams County and to pay the county a "host fee" on every ton of waste disposed of at the landfill. Last, the Agreement itself says that "[p]ursuant to the terms of this Agreement, the Commissioners grant an unclassified use permit for the construction and operation of one non-hazardous solid waste landfill and recycling facility . . . subject to all of the conditions contained in this Agreement." Admin. R. at 11705.

██ First, we reject OPAL's contention that the Agreement constitutes a contract for which the county is required to seek competitive bids. The Agreement obligates Waste Management to pay host fees, a community grant, and to provide other benefits to the county, regardless of whether the county chooses to dispose of its own wastes at the landfill. The Agreement does not, however, obligate the county to "purchase . . . materials, equipment, or supplies" as described by RCW 36.32.245. The package of benefits agreed to by Waste Management is simply not within the purview of the public procurement statute because it involves no expenditure on the part of the county.

We also conclude that the public proposal requirements of RCW 36.58.090 do not apply to invalidate the offer by Waste Management to provide the county with free solid waste disposal. According to the terms of the statute, a county may enter a contract for the provision of solid waste services only after it publishes its requirements and requests submission of proposals. RCW 36.58.090(2). Here, contrary to OPAL's assertions, the county has not entered into a contract for solid waste services. The Agreement explicitly states that the county is under no obligation to accept Waste Management's offer:

[T]he Parties acknowledge that the County is in the process of a procurement decision on how to handle the County's Authorized Solid Waste and is considering several options including transportation to and disposal at the Regional Landfill . . . . The firm offer by WMW [Waste Management] . . . has not, by approval of the Unclassified Use Permit and execution of this Agreement, been accepted by the County.

Admin. R. at 11734. As Respondent argues, OPAL's procurement argument is not yet ripe because the county has not accepted the offer of solid waste services contained in the mitigation agreement.[4] Because the Agreement is not a contract for the provision of solid waste services entered into contrary-to-statutory requirements, the issuance of the UUP is not thereby invalidated.

OPAL's final argument is that the UUP should be invalidated because its issuance was conditioned on an agreement by Waste Management to make various "voluntary" payments to the county, which do not satisfy the requirements for voluntary mitigation under either Washington's impact fee statute or SEPA. The trial court concluded that OPAL lacks standing to assert a violation of RCW 82.02.020 because it is not within the zone of interests intended to be protected by the statute.

This court applies a two-part test to determine if an organization has standing to challenge governmental actions. *Save a Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978) (citing *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152-53, 90 S.

---

[4]OPAL and Amicus Curiae Regional Disposal Company assert that the issue is ripe because the procurement laws forbid negotiation of a contract without competitive bidding. Opening Br. of Appellant at 48; Br. of Amicus Curiae Reg'l Disposal Co. at 11 (citing *Platt Elec. Supply, Inc. v. City of Seattle*, 16 Wn. App. 265, 269, 555 P.2d 421 (1976), *review denied*, 89 Wn.2d 1004 (1977)). The claim in *Platt*, however, was brought *after* the city awarded a contract to one of seven bidders. 16 Wn. App. 267-68. The city had solicited bids from various suppliers and then *negotiated with an individual bidder to obtain a lower bid price. Id.* The Seattle City Charter governing the transaction, like the state procurement laws in question here, focused on the entry into a contract. *Id.* at 270 ("All such contracts *shall be awarded to the lowest and best bidder* . . . .") (underline emphasis added).

Ct. 827, 25 L. Ed. 2d 184 (1970). The first part of the test is that the interest sought to be protected is "arguably within the zone of interests to be protected or regulated by the statute . . . in question . . . ." *Save,* 89 Wn.2d at 866.

Under Washington's impact fee statute, counties are prohibited from imposing "any tax, fee, or charge, either direct or indirect, on . . . the development, subdivision, classification, or reclassification of land." RCW 82.02.020. The statute does not, however, "prohibit voluntary agreements with counties . . . that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development . . . ." *Id.* The statute further provides that such payments must be kept in a reserve account, may be expended only to fund "a capital improvement agreed upon by the parties to mitigate the identified, direct impact," must be spent within five years, and must be refunded to the property owners if not expended. RCW 82.02.020(1)-(3).

OPAL and its individual members are not within the zone of interests to be protected by RCW 82.02.020. This statute seeks to protect developers from fees or taxes that are not "reasonably necessary as a direct result of the proposed development . . . ." RCW 82.02.020. This court has accordingly held that fees imposed upon developers that do not comply with the requirements of the statute are "unauthorized, constitute an illegal tax, fee or charge and result in an unjust enrichment to the City . . . ." *Henderson Homes, Inc. v. City of Bothell,* 124 Wn.2d 240, 244, 877 P.2d 176 (1994).

OPAL argues that it meets the first prong of standing because the statute seeks to protect the community by providing strict limitations on how the voluntary fees may be expended. But the statute provides that payments that are not expended on projects to mitigate the identified, direct impact of development must be returned with interest *to the developer.* RCW 82.02.020(3). A plain reading of this provision in the context of the entire statute suggests

that it serves the same purpose as the statute as a whole—to protect developers from a generalized tax on development by requiring that money be either expended to address a particular impact or returned.

OPAL's argument as to its right to assert a SEPA violation fails for the same reasons the above argument failed—the cited provision of SEPA seeks to protect developers from general fees on development. SEPA provides that government action may be conditioned "only to mitigate specific adverse environmental impacts which are identified in the environmental documents prepared under this chapter." RCW 43.21C.060. Because OPAL lacks standing to assert its claim regarding the validity of the voluntary payments agreement, we do not consider the merits of its argument that the UUP should be invalidated on this basis.

CONCLUSION

The Adams County commissioners' decision to issue the UUP to Waste Management for its proposed private, regional landfill is affirmed.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, ALEXANDER, and TALMADGE, JJ., concur.