# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| APTLY TECHNOLOGY CORPORATION, a Washington corporation, | No. 86102-6-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| YUNJUN WU and RICHARD LU, wife and husband and the marital community comprised thereof, | |
| Appellants. | |

FELDMAN, J. — Yanjun (Juni) Wu, Qi (Richard) Lu, and DeManaCo, LLC (Defendants) appeal from the trial court's final judgment in favor of Aptly Technology Corporation (Aptly) on its breach of contract and tortious interference with business expectancy claims. Defendants also appeal, and Aptly cross-appeals, from the trial court's ruling awarding attorney fees in favor of Defendants on one of Aptly's misappropriation of trade secrets claims under Washington's Uniform Trade Secrets Act (UTSA). We reverse in part the award of attorney fees, but otherwise affirm.

I

Aptly is an information technology consulting company that provides software development and design services to Microsoft Corporation. Xingsuo

(Rosa) Li, the owner of Aptly, hired Wu as Vice President of Business Development. Wu's responsibilities included selling consulting services to Microsoft. Wu is married to co-defendant Lu, who owns a consulting company called DeManaCo, LLC together with co-owner Xiaoou (Olivia) Wang. During the relevant time period, Wang was an employee of another company that provided consulting services to Microsoft, Biblioso, at the same time she co-owned DeManaCo. Like Aptly, DeManaCo also provided consulting services to Microsoft; it did so as a subcontractor of Biblioso.

While Wu was managing one of Aptly's staffing engagements[1] at Microsoft, Aptly suspected her of improper practices in violation of her employment agreement. Following an investigation, Aptly brought several claims against Defendants for diverting consulting work from Aptly to DeManaCo through Biblioso. The complaint included breach of contract claims, tortious interference with business expectancy claims, and misappropriation of trade secrets claims. The misappropriation claims were based on Wu's transmission to DeManaCo of (a) Aptly's "gross margin calculator," (b) a "step-by-step template" Aptly used for creating work product, and (c) sample communications between Aptly and Microsoft.

---

[1] The record below establishes that consulting companies provide services to Microsoft under two possible engagement models: "staffing engagements" and "managed service engagements." In staffing engagements, Microsoft interviews, approves, and supervises individuals performing work. The individuals may perform work for Microsoft for up to eighteen months before taking a mandatory six-month break pursuant to Microsoft's policy. In managed service engagements, a consulting company manages a fully outsourced service without Microsoft's oversight or approval of individual resources, and the individuals working on the managed service are not subject to the eighteen month maximum. Several witnesses testified that managed service engagements are more profitable—and thus more desirable—than staffing engagements.

The matter proceeded to a bench trial. In an oral ruling following the trial, the trial court largely decided the matter in Aptly's favor. Relevant here, the court found Microsoft approached Wu to start a managed service with Aptly, but Wu directed Microsoft to Biblioso instead. The court also found that, around this same time, Lu (Wu's husband) created DeManaCo with Wang (a Biblioso employee). After Microsoft awarded the managed service to Biblioso, Biblioso immediately subcontracted the service to DeManaCo. The court thus concluded Wu breached her Employee Agreement with Aptly. The trial court also concluded Wu and DeManaCo had tortiously interfered with Aptly's business relationship with Microsoft. The court determined Aptly was entitled to damages for lost profits over a three-year period from January 2021, when Defendants' wrongful conduct began, to the end of 2023, when the managed service was expected to end. The court subsequently entered written findings of fact and conclusions of law awarding Aptly damages totaling $788,974.76.

Defendants then filed a CR 59 motion to reopen the trial, for reconsideration and/or amendment of the findings of fact and conclusions of law arguing, among other things, that new evidence was available that affected the calculation of damages. The trial court granted the motion with regard to the end date of the contract with Microsoft and denied the motion as to all other issues. The court then amended and supplemented the findings of fact and conclusions of law to reflect its new finding that the time frame for which to calculate lost profits was shorter than was previously found. The trial court reduced its damages award to $633,044.94 to reflect the shortened period of lost profits.

While the trial court largely decided the breach of contract and tortious interference with business expectancy claims in Aptly's favor, it ruled in favor of Defendants on Aptly's misappropriation of trade secrets claims. The trial court dismissed Aptly's misappropriation claim related to the "step-by-step template" in response to Defendants' motion to dismiss the claim at the close of Aptly's evidence at trial. Then, following trial, the court rejected the two remaining misappropriation claims. Defendants subsequently filed a motion for an award of attorney fees for their successful defense against these claims, which the trial court granted solely with regard to the misappropriation claim relating to the step-by-step template. Aptly filed a motion for reconsideration of the fee award, which the trial court denied.

Defendants appeal. Aptly cross-appeals.

II

Defendants argue the trial court erred by awarding Aptly damages based on its breach of contract and tortious interference with business expectancy claims. More specifically, they broadly attack the trial court's findings and conclusions regarding causation and proof of damages.

Our review of these issues is deferential to the trial court's fundamental role as fact-finder. "Where there is conflicting evidence, it is not the role of the appellate court to weigh and evaluate the evidence*." Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 526, 832 P.2d 537 (1992). Rather, our "role is simply to determine whether substantial evidence supports the findings of fact and, if so, 'whether the findings in turn support the trial court's conclusions of law.'" *In re Marriage of*

*Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999) (quoting *Org. to Preserve Agric. Lands v. Adams County*, 128 Wn.2d 869, 882, 913 P.2d 793 (1996)). "Questions of credibility are left to the trier of fact and will not be overturned on appeal." *State v. Boot*, 89 Wn. App. 780, 791, 950 P.2d 964 (1998). Moreover, in conducting our review, we view the evidence in the light most favorable to the prevailing party, here Aptly. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013).

Applying this deferential standard of review, Defendants' arguments easily fail, as substantial evidence supports the trial court's findings and those findings, in turn, support the trial court's conclusions of law.[2]

A

Starting with Defendants' causation arguments, lost profits are recoverable as damages "when . . . they are the proximate result of defendant's breach." *Tiegs v. Watts*, 135 Wn.2d 1, 17, 954 P.2d 877 (1998). There must be "certainty as to the fact that damage resulted from defendant's breach." *Id*. at 18. Addressing this requirement, the trial court ruled, "Wu's actions by diverting work to Biblioso proximately caused the chain of events that led to Biblioso being awarded the Managed Service Contract for Bing Answers." In its amended findings of fact and

---

[2] While Defendants also challenge the trial court's ruling denying in part their motion to dismiss Aptly's claims under CR 41(b)(3), where, as here, a court denies a CR 41(b)(3) motion and the claim proceeds, "appellate review is limited to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law." *In re Dep. of Schermer*, 161 Wn.2d 927, 940, 169 P.3d 452 (2007). We therefore focus on the trial court's findings and conclusions as indicated in the text above. Defendants also challenge the trial court's order denying their motion for reconsideration following trial. We review that ruling "for abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *River House Dev. Inc. v. Integrus Architecture, PS*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012).

conclusions of law, the court likewise concluded, "Wu's breach of her Employee Non-Disclosure Agreement legally and proximately caused damage to Aptly in the form of past lost profits."

Substantial evidence supports the trial court's causation findings. In March 2020, Wu and Li sent Microsoft a proposal to convert Aptly's existing Bing Answers staffing engagement to a managed service. Several months later, the Microsoft lead for Bing Answers, Hu (Hunk) Chen, expressed interest in moving forward with the managed service Aptly proposed. He testified that he asked Wu, then an employee of Aptly, how to set up the managed service. He further testified that when he sought to expand the project, he only contacted one consulting company—Aptly—explaining, "I used to work only with Aptly, so [I would] contact only Aptly." Instead of recommending a managed service engagement with Aptly as requested by Microsoft, Wu directed Chen to a competitor, Biblioso. Testimony at trial established that Microsoft decided to engage Biblioso based on Wu's recommendation. Shortly after Wu set up the introduction to Biblioso, Microsoft entered into a managed service agreement with Biblioso for the Bing Answers project. Biblioso then sub-contracted the project to DeManaCo, the company co-owned by Wu's husband.

Additional evidence at trial also shows Aptly would have been awarded the engagement but for Wu's interference, when Microsoft management expressed displeasure with the quality of Biblioso's work and indicated it would cancel the managed service and return to working exclusively with Aptly unless Biblioso improved. An e-mail to Defendants and Biblioso stated:

> I always emphasize vendor quality is important. If I still receive just-so-so feedback on current vendor team, I won't grow the managed service and move back to st[a]ff mode. It is easy for me to choose Aptly because they already prove the vendor quality in history. Aptly already propose[d] the managed service mode to me.

As the e-mail indicates, in the absence of Wu's interference, Microsoft would have continued working with Aptly.

The trial court also found Wu was acting as an agent of DeManaCo when she steered the Bing Answers contract away from Aptly in January 2021. The record shows that in the weeks before Biblioso began the managed service, Wu sent Wang documents Aptly used in its work with Microsoft, including an internal gross margin (profitability) calculator for determining the pricing of consulting contracts, a step-by-step template consulting companies used to create work product for Microsoft, and several sample presentations for communicating effectively with Microsoft. Meanwhile, Wang and Lu set up DeManaCo. As soon as the service began in January 2021, Biblioso executed a sub-contracting agreement with DeManaCo. The trial court summarized its consideration of this issue by stating, "[t]here is just a great deal of circumstantial evidence that persuades me, as the Finder of Fact, at this time Juni Wu was acting as Demanaco's agent and for its benefit at the time she steered the contract away on the Bing Answers project."

Trial testimony also established that Aptly's opportunity to provide a managed service to Microsoft was lost as a result of Defendants' conduct because Microsoft did not have the budget to hire both companies. Despite Aptly's renewed attempt in March 2021 to provide a managed service after Defendants'

interference in January, Microsoft "did not consider their proposal because at the time we simply didn't have any more budget to accommodate another new managed service provider." Consequently, as expert testimony confirmed, "starting January 2021, we see that Aptly's revenue stream in connection with the Bing Answers Project fell off fairly precipitously . . . all the way down to zero." Thus, substantial evidence supports the finding that Aptly's lost profits were the proximate result of Wu's conduct.

The foregoing testimony supports the trial court's findings that but for Wu's introduction of Biblioso to fulfill the managed service contract, Microsoft would have hired Aptly for the service. The trial court concluded, "had Juni Wu not steered the contract . . . from Aptly to Biblioso, it is more probably [than] not true that Aptly would have received the contract." The trial court also found, "had Microsoft found Biblioso was not continuing to perform at the standard required . . . Aptly might have received the Managed Service Contract." Contrary to Defendants' argument, substantial evidence supports the trial court's determination that Aptly's lost profits were the proximate result of Defendants' improper conduct.

B

Turning to Defendants' arguments regarding proof of damages, Defendants claim Aptly did not establish its damages with reasonable certainty. In so arguing, Defendants rely heavily on our Supreme Court's opinion in *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 390 P.2d 677 (1964). Defendants' arguments are unpersuasive, as is their reliance on *Larson*.

As *Larsen* confirms, "The usual method of proving lost profits is from profit history." *Id.* at 16. Addressing such a damages methodology, the court noted:

A measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty, is sometimes difficult to find. Plaintiff must produce the best evidence available and if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the amount of the damage is incapable of exact ascertainment.

*Id.* (internal quotation marks omitted). The court added:

A reasonable method of estimation of damages is often made with the aid of opinion evidence. Experts in the area are competent to pass judgment. So long as their opinions afford a reasonable basis for inference, there is departure from the realm of uncertainty and speculation. Expert testimony alone is a sufficient basis for an award for loss of profits.

*Id.* at 17. And the court also noted, "damages which are remote and speculative cannot be recovered." *Id.* at 16.

Substantial evidence supports the trial court's damages award. The trial court correctly noted, as *Larsen* confirms, "damages need only be reasonably ascertainable." *See id*. The court then explained it accepted "in part" the analysis of both Aptly's and Defendants' damages experts. The trial court "looked extensively at Exhibit 45," which summarized Aptly's 2019-22 revenues on Bing Answers staffing engagements, and also considered the testimony of both Aptly's and Defendants' experts. Thus, the trial court relied on historical profits and expert testimony—the two types of evidence *Larsen* characterizes as "best."

Defendants claim the evidence upon which the trial court relied was not "the best evidence available" and, thus, its damages award is "properly reversed." Defendants' argument is premised on our Supreme Court's statement in *Larsen*,

quoted above, that "Plaintiff must produce the best evidence available." 65 Wn.2d at 16. Their reliance on *Larsen* is misplaced. The court in *Larsen* reduced the lost profits award because the experts there had relied on a lost profits analysis for a business that was merely "hypothetical," as the business never successfully operated. *Id.* at 3-5. Here, unlike *Larsen*, Aptly was able to furnish historical profits, and such evidence is, in the words of *Larsen*, "the usual method of proving lost profits." *Id.* at 16. Thus, *Larsen* does not support Defendants' argument.

Defendants also argue the trial court should have used DeManaco's subcontracting agreement with Biblioso as a better estimate of the revenue Aptly would have received from Microsoft had Defendants not diverted the engagement. Addressing this argument in Defendants' unsuccessful motion for reconsideration, the trial court explained:

> [A]ll parties had a full and fair opportunity to present their evidence. Ex 100 was not at the center of the case during the trial. A damages analysis was presented by plaintiff, and defendants critiqued it. The Court will not consider a new damages analysis now. The Court considered the trial evidence and did so with great care, understanding the stakes at hand.

Since we do not review credibility determinations on appeal and substantial evidence supports the trial court's analysis, and because "Civil Rule 59 does not permit a [party], finding a judgment unsatisfactory, to suddenly propose a new theory of the case" (*Eugster v. City of Spokane*, 121 Wn. App. 799, 810, 91 P.3d 117 (2004)), we reject this argument.

Lastly, Defendants assert several additional arguments attacking the trial court's damages analysis. They claim, for example, that the trial court inflated the Bing Answers annual revenue, erred by using the value of Aptly's historical staffing

engagements to calculate lost profits, erroneously relied on "contracted gross revenue" instead of actual invoiced revenue, and awarded a "double recovery." These arguments are intensely factual and ignore the applicable standard of review. We have carefully reviewed the entire record alongside Defendants' arguments and Aptly's responses. While there is testimony supporting the contentions of both sides, the trial court accepted the testimony presented by Aptly, which supports the findings of fact to which error is assigned. Those findings, in turn, support the trial court's conclusions. Since we do not retry disputed issues of fact on appeal, we affirm the trial court's damages analysis in addition to its causation analysis.

III

In its cross-appeal, Aptly argues the trial court abused its discretion in awarding attorney fees in favor of Defendants for their defense against the misappropriation of trade secrets claim relating to the step-by-step template. Defendants, in turn, argue all three of Aptly's misappropriation claims were made in bad faith and, as a result, the trial court should have awarded attorney fees in their favor on all three claims, not solely the claim related to the step-by-step template. We agree with Aptly and disagree with Defendants

Addressing Aptly's misappropriation claim regarding the step-by-step template, the trial court ruled:

> [T]he Court hereby GRANTS IN PART Defendants' motion for attorneys' fees, but no costs or expenses, in the amount of $68,516.50 under RCW Chapter 19.108 with respect to Aptly's UTSA cause of action asserting the factually baseless claim that Trial Exhibit 304 belonged to and was Aptly's trade secret. The Court concludes that because that claim, along with the testimony of Ms.

- 11 -

Rosa Li that supported it, was factually baseless, Aptly made that claim of misappropriation in bad faith for purposes of RCW 19.108.040.

We review this ruling for abuse of discretion. *Thola v. Henschell*, 140 Wn. App. 70, 89, 164 P.3d 524 (2007). Relevant here, a trial court "abuses its discretion if its ruling is based on an erroneous view of law or on a clearly erroneous assessment of the evidence." *Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 530, 20 P.3d 447 (2001).

Washington's UTSA authorizes trial courts to grant attorney fees in favor of a prevailing party "[i]f a claim of misappropriation is made in bad faith." RCW 19.108.040. Neither the UTSA nor any Washington appellate court defines the phrase "bad faith" as it applies to UTSA claims. The parties' briefing presents several possible definitions. Aptly notes, for example, that a Washington court defined "bad faith" in an analogous context in *Rogerson Hiller Corp. v. Port of Port Angeles*, 96 Wn. App. 918, 929-30, 982 P.2d 131 (1999). *Rogerson* reversed an attorney fee award based on the equitable grounds of a party's "bad faith" relating to a sheriff's sale of a lessee's equipment, concluding that "[b]ringing a frivolous [claim] is not enough, there must be evidence of an intentionally frivolous claim brought for the purpose of harassment." *Id.* at 929 (citing *In re Recall of Pearsall-Stipek,* 136 Wn.2d 255, 267, 961 P.2d 343 (1998) (internal quotations omitted)).

Both Aptly and Defendants also cite to California case law defining the phrase "bad faith" for purposes of its trade secrets act, which requires both objective speciousness of the claim and subjective misconduct by the plaintiff in making the claim. *Gemini Alum. Corp. v. Cal. Custom Shapes, Inc.*, 95 Cal. App.

- 12 -

4th 1249, 116 Cal. Rptr. 2d 358 (2002).  Similar to our Supreme Court's definition of "bad faith" in *Rogerson*, California courts have held that the subjective misconduct prong of this test may be established "by evidence that appellants intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive."  *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1278, 95 Cal. Rptr. 3d 307 (2009) (citing *Gemini*, 95 Cal. App. 4th at 1261).  This and other definitions of "bad faith" cited by the parties share a common feature: something more than failing to establish the elements of the claim is required, and bad faith is found where a party intentionally asserted a frivolous claim for an improper purpose, such as unnecessary delay or harassment.

When asked at oral argument to identify evidence of bad faith, Defendants stated Li falsely claimed in a sworn declaration that Aptly "created" the step-by-step template.  Addressing this issue, the trial court explained at the hearing on Defendants' motion for attorney fees that Li "must have known" exhibit 304 was not a trade secret because the step-by-step template "belonged" to Microsoft.  Even so, Aptly's claim was not intentionally frivolous as required to establish bad faith.  To the contrary, Li testified at trial that Microsoft and Aptly each contributed to the development of the template.  Consistent with Li's testimony, a Microsoft employee testified that although Microsoft developed the software behind the template, the reason it hired Aptly (and other consulting companies) was to design the content *collaboratively*.  In addition, Wu e-mailed the step-by-step template to Biblioso the day after DeManaCo was formed, supporting Aptly's reasonable belief that such conduct was a misappropriation of a confidential Aptly work product.

Aptly also made a colorable argument in support of its misappropriation claim based on federal authority, which recognizes such a claim even when the asserted trade secret was created by a third party. In support of this argument, Aptly cited *DTM Research, L.L.C. v. AT&T Corp.*, 245 F.3d 327, 333 (4th Cir. 2001), which holds that if a claimant possesses confidential information belonging to a third party and both parties "have undertaken to maintain its secrecy, the information might well still have value and therefore satisfy the definition of a trade secret." Testimony as to the confidentiality of the template was mixed at trial, but a Microsoft employee testified the template was confidential. Because the record establishes a tenable basis for the claim, and there is no evidence of improper motive on the part of Aptly, the trial court abused its discretion in ruling that the misappropriation claim relating to the step-by-step template was made in bad faith.

For similar reasons, we affirm the trial court's denial of Defendants' motion for attorney fees related to their defense of the two other misappropriation claims. In its ruling on attorney fees for the other claims, the trial court noted "there was at least a basis for the [margin calculator] claim" and the claim based on the sample communications "was not in bad faith." The record supports the trial court's determination. Evidence at trial established the margin calculator was available only to Aptly employees and the sample communications were "highly confidential" to Aptly and were marked with instructions "please do not share," yet Wu transmitted the materials to Defendants and her personal e-mail at the same time DeManaCo was created. Nor is there any evidence as to these two misappropriation claims that Aptly asserted an intentionally frivolous claim for the

purpose of harassment or any other improper purpose. Because there was a factual basis for the underlying claims as to the gross margin calculator and sample communications, and no evidence of improper motive on the part of Aptly, the trial court's ruling denying fees related to those claims was not an abuse of discretion.

IV

Lastly, Defendants claim they are entitled to an award of attorney fees on appeal under RCW 19.108.040. RAP 18.1 addresses attorney fees on appeal and provides that the party seeking appellate fees "must" devote a section of its opening brief to the request for the fees or expenses. RAP 18.1(b). Requests that do not comply with this directive are properly denied. *Osborne v. Seymour,* 164 Wn. App. 820, 866, 265 P.3d 917 (2011) (compliance with RAP 18.1(b) is mandatory). Here, Defendants failed to devote a section of their opening brief to the request. Because Defendants did not comply with RAP 18.1(b), we deny their request for attorney fees on appeal.

Affirmed in part, reversed in part.

Feldman, J.

WE CONCUR:

Coburn, J.

, ACJ

- 15 -