259 F.3d 996 (9th Cir. 2001)
 BRIAN CLARK, DBA VISIONS, PLAINTIFF-APPELLANT
v.
CITY OF LAKEWOOD, DEFENDANT-APPELLEE
 No. 99-35453
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 8, 2000
August 6, 2001
Amended August 15, 2001
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Counsel: Jack R. Burns, Bellevue, Washington, for the plaintiff-appellant.
 
 
 3
 Phil Brennan, Dennis J. La Porte, Daniel B. Heid, Krilich, La Porte, West & Lockner, Tacoma, Washington, for the defendant-appellee.
 
 
 4
 Before: Betty B. Fletcher and Raymond C. Fisher, Circuit Judges, and William W Schwarzer,* District Judge.
 
 Opinion by Judge Fisher
 OVERVIEW
 
 5
 Bryan Clark, the owner of three closed adult businesses in the City of Lakewood, brought this lawsuit challenging Lakewood's new adult cabaret ordinance ("Ordinance"). Clark claims the Ordinance violates the First Amendment of the United States Constitution and the free speech provisions of the Washington Constitution and was passed in violation of the Washington Open Public Meetings Act ("OPMA"). Both Clark and the City of Lakewood moved for summary judgment. The district court granted summary judgment in favor of Lakewood concluding that Clark lacked standing and that the Ordinance was constitutional. We reverse. We hold that Clark has standing to raise most of his claims. We further hold that Lakewood developed its factual findings for the Ordinance in violation of the OPMA, thereby making them "null and void," so that the Ordinance itself may lack evidentiary support and may therefore be unconstitutional. We also conclude that the Ordinance's 21-day waiting period for managers on its face violates the Washington Constitution.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 6
 A. The Adult Task Force and Passage of the Ordinance
 
 
 7
 In May 1996, the Lakewood City Council authorized the Lakewood Planning Advisory Board ("Board") to analyze adult entertainment uses within the city. The Board is a seven-member body that provides recommendations to the City Council on land use issues, development regulations and other control measures. The Board formed a subcommittee, the Lakewood Adult Entertainment Task Force ("Task Force"), to analyze all aspects of adult entertainment in the city. The Board made five formal appointments to the Task Force: three members and two citizens who were in favor of strict regulation of adult businesses.
 
 
 8
 The Task Force conducted 10 or 11 meetings, the majority of them closed to the public.[1] According to Michael Bugher, the City of Lakewood's staff member for the Task Force, "task force members preferred that there be occasions when there would not be the public present." While it is unclear what occurred at any specific meeting, the Task Force conducted numerous and diverse tasks. From September 1996 to February 1998, the Task Force toured the adult entertainment businesses in Lakewood, took testimony from Lakewood police officers and members of Washington Together Against Pornography, received business license data on adult businesses, reviewed adult entertainment license fees, examined ownership of adult businesses in Lakewood, surveyed manager and entertainer demographics and met with adult cabaret representatives. The Task Force also reviewed various other cities' adult entertainment regulations, the studies those cities had conducted and federal and state court decisions on the constitutionality of adult entertainment regulation.
 
 
 9
 With this background, the Task Force drafted a report on the regulation of adult businesses. According to the report itself, it "constitutes the background, findings and conclusions of the Task Force. It represents the basis for which the City may, if it deems it appropriate, amend adult entertainment regulations pertaining to both business and land use operations now or in the future." The Report discussed the common "secondary effects" associated with adult entertainment --particularly crime, worsened public health and decreased property values -and made various findings and conclusions about those effects in Lakewood. In addition to the report, the Task Force drafted a new adult cabaret ordinance.
 
 
 10
 The Task Force submitted its report and recommendations to the Planning Advisory Board on March 18, 1998. Soon afterwards, the Lakewood adult entertainment industry submitted to the Board a response to the report. The Board considered these materials and public comments and, on April 15, 1998, recommended to the City Council that it pass a new adult cabaret ordinance. At the same time, the Board forwarded the Task Force's report to the City Council.
 
 
 11
 On May 18, 1998, the Lakewood City Council held a public meeting to consider adopting the proposed new adult cabaret ordinance. According to Bugher, the only evidence the City Council considered was the Task Force's report and the adult entertainment owners' response to that report. At the meeting, the City Council voted to adopt the new adult cabaret regulations and passed Ordinance 171, now codified in the Lakewood Municipal Code ("LMC") at §§§§ 5.16.000 -5.16.120. (See Lakewood Municipal Code 5.16.00-5.16.120, Appendix to this Opinion.)
 
 
 12
 The Ordinance, among other things, requires: (a) adult cabaret owners, managers and entertainers to obtain city-issued licenses and in some instances wait 21 or 35 days for their applications to be processed before being able to work or operate; (b) license applicants to disclose their home addresses and phone numbers; (c) an eight-foot separation between the stage and patrons; (d) a four-foot separation between a patron and an entertainer providing a personalized (i.e. "table" or "lap") dance; (e) a three-foot high continuous railing surrounding the stage; (f) minimum lighting provided in all public areas; (g) cabarets to maintain records of their employees; and (h) cabarets to close from 2:00 a.m. to 11:00 a.m. daily. The Ordinance further prohibits the ownership of multiple adult businesses in the City of Lakewood.
 
 B. Bryan Clark's Business
 
 13
 At the time the Ordinance was passed, Bryan Clark operated an adult business in Lakewood that included an adult cabaret, an adult bookstore and panoram devices for exhibiting adult motion picture films. "Visions," the adult cabaret portion of the business, offered nude and semi-nude dance entertainment in approximately 2,000 square feet of floor space. In addition, it offered personalized dances to members of the audience willing to pay for them.
 
 
 14
 After the Ordinance was passed, Clark made several changes to his business to comply with the new regulations. He claims the Ordinance's restrictions had a substantial negative effect upon his business, requiring him to reduce the seating capacity of his cabaret dramatically and reduce the number of entertainers performing at any one time. Clark claims that as a result of the Ordinance, his business began losing money and he was forced to close its doors.
 
 
 15
 Clark had a license to operate his business for the 1998 calendar year. That license was issued under the old licensing scheme in effect prior to the adoption of Ordinance 171. Under the new Ordinance, Clark's license expired on December 31, 1998 and had to be renewed by January 31, 1999. See LMC §§ 5.16.060. There is nothing in the record to indicate that Clark has since renewed his license or reapplied for a new license to operate an adult cabaret.[2]
 
 C. The Lawsuit
 
 16
 Clark filed suit in federal court on June 19, 1998 alleging that the Ordinance violates the United States and Washington Constitutions and the OPMA. He seeks declaratory, injunctive and monetary relief.
 
 
 17
 Clark moved for partial summary judgment in January 1999. Lakewood answered with a cross-motion for complete summary judgment in February. At the April 2, 1999 summary judgment hearing, the district court stated that the Ordinance was constitutional and that Clark lacked standing to raise some of the issues in his lawsuit. The court did not explain why the Ordinance was constitutional and why Clark lacked standing, but instead stated that it was satisfied with the reasoning of Lakewood's brief in support of its motion. The district court denied plaintiff's motion, granted defendant's motion and entered judgment in favor of Lakewood. Clark filed a timely notice of appeal on April 28, 1999. We have jurisdiction pursuant to 28 U.S.C. §§ 1291.
 
 STANDARD OF REVIEW
 
 18
 A district court's grant of summary judgment is reviewed de novo. See Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc); Laborers Health & Welfare Trust v. Westlake Dev., 53 F.3d 979, 981 (9th Cir. 1995). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, (a) "the district court correctly applied the relevant substantive law" and (b) there are no genuine issues of material fact in dispute. Id. We review de novo the question whether a party has standing to bring an action. LSO, Ltd. v. Stroh, 205 F.3d 1146, 1152 (9th Cir. 2000).
 
 DISCUSSION
 
 19
 Clark levels a broadside attack on the Ordinance on several grounds. First, he argues the Ordinance was passed in violation of the Open Public Meetings Act. Second, he argues the Ordinance violates the United States and Washington Constitutions' guarantees of free speech. He makes a facial overbreadth challenge to the entire Ordinance, claiming Lakewood has not put forth sufficient evidence to justify these regulations and that the burdens they place upon free speech are unwarranted. Specifically, he claims that:
 
 
 20
 (a) The 35-day and 21-day licensing waiting periods for owners and managers, respectively, is an unconstitutional prior restraint because a decision to issue or deny a license is not made within a brief, specified and reasonably prompt period of time. See Baby Tam & Co. v. City of Las Vegas, 154 F.3d 1097, 1100-01 (9th Cir. 1998); Ino, Ino, Inc. v. City of Bellevue, 132 Wash. 2d 103, 123 (1997).
 
 
 21
 (b) The licensing requirement for entertainers is also an unconstitutional prior restraint because there is no stay from a decision upholding a license denial and because there is no right to prompt judicial review and decision. See Baby Tam, 154 F.3d at 1100-01.
 
 
 22
 (c) The forced disclosure of license applicants' home addresses and phone numbers does not further a substantial government interest, in violation of the First Amendment. See Acorn Investments, Inc. v. City of Seattle, 887 F.2d 219, 225 (9th Cir. 1989); see also Buckley v. Valeo, 424 U.S. 1, 64-66 (1976).
 
 
 23
 (d) There is no justification for requiring stage dancers to be eight feet away from the audience, entertainers to stay four feet from patrons while not on stage, a three-foot high railing surrounding the stage, minimum lighting or that cabarets maintain employee records. See Alameda Books, Inc. v. City of Los Angeles, 222 F.3d 719, 724-27 (9th Cir. 2000).
 
 
 24
 (e) The prohibition on owning or operating multiple businesses is an unconstitutional prior restraint that lacks sufficient justification. See id.
 
 
 25
 Although there has been some confusion in the past, five members of the Supreme Court have agreed that nude dancing is expressive conduct protected by the First Amendment, albeit only at the "outer ambit" of the Amendment's protection. See City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000); Colacurcio v. City of Kent, 163 F.3d 545, 549 (9th Cir. 1998) (stating that at that time there was confusion about the level of First Amendment protection accorded nude dancing). The level of constitutional protection and the type of analysis we apply to nude dancing regulations differs depending upon the type and purpose of the restriction. In all situations, however, the government has the burden of proof to justify burdening freedom of expression. Alameda Books, 222 F.3d at 724 n.6.
 
 
 26
 Restrictions upon nude dancing are considered content-neutral because they are aimed at the so-called secondary effects of nude dancing and not at expressive conduct. Pap's A.M., 529 U.S. at 289-92. "The State's interest in preventing harmful secondary effects is not related to the suppression of expression. In trying to control the secondary effects of nude dancing, the ordinance seeks to deter crime and the other deleterious effects caused by the presence of such an establishment in the neighborhood." Id. at 293.
 
 
 27
 Regulations upon nude dancing are analyzed as time, place and manner restrictions and do not violate the First Amendment if they pass the O'Brien test. Id. at 289. Under that test, a regulation of nude dancing is sufficiently justified if: (a) there is a substantial government interest; (b) the regulation furthers that government interest; (c) the interest is unrelated to the suppression of free expression; and (d) the restriction is no greater than is essential to the furtherance of the government interest. Id. at 296-302; see United States v. O'Brien, 391 U.S. 367, 377 (1968).[3]
 
 
 28
 A licensing scheme regulating nude dancing is considered a prior restraint because the enjoyment of protected expression is contingent upon the approval of government officials. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 223-24 (1990); Baby Tam, 154 F.3d at 1100. While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing a heavy presumption against its constitutional validity. FW/PBS, 493 U.S. at 225. Like other regulations upon nude dancing, prior restraints can be imposed only if they are reasonable time, place and manner restrictions. United States v. Baugh, 187 F.3d 1037, 1042 (9th Cir. 1999). In addition, an adult entertainment licensing scheme must contain at least two procedural safeguards. See 4805 Convoy, Inc. v. City of San Diego, 183 F.3d 1108, 1113 (9th Cir. 1999). First, a decision to issue or deny a license must be made within a brief, specified and reasonably prompt period of time. Baby Tam, 154 F.3d at 1101; see FW/PBS, 493 U.S. at 226. Second, there must be prompt judicial review in the event a license is denied.[4] Baby Tam, 154 F.3d at 1100-01; see FW/PBS, 493 U.S. at 226.[5]
 
 
 29
 Before we can reach the merits of Clark's First Amendment challenges, however, we must resolve several issues. First, is this matter justiciable -that is, does Clark have standing and, even if he does, has the case become moot? Second, was the Ordinance passed in violation of the OPMA such as to render the Ordinance null and void?
 
 I. STANDING AND MOOTNESS
 
 30
 This case raises questions of both standing and mootness. When Clark filed this lawsuit his adult cabaret business had been closed for approximately one month. At that time, he continued to hold a license to operate an adult cabaret in Lakewood and his stated intention was to return to business if the Ordinance were declared unconstitutional. During the pendency of the lawsuit, Clark's license expired and he did not apply for a new license or renew his old one. All of these circumstances raise the question of whether there is an actual case or controversy that is suitable for adjudication.
 
 
 31
 The case or controversy limitation on federal judicial authority found in Article III, §§ 2 underpins the doctrines of both standing and mootness. Friends of the Earth, Inc. v. Laidlaw Envtl Servs, 528 U.S. 167, 180 (2000). The two inquiries, however, differ in critical respects. Id. Standing is determined by the facts that exist at the time the complaint is filed. Lujan v. Defenders of Wildlife, 504 U.S. 555, 569 n.4 (1992). Mootness inquiries, however, require courts to look to changing circumstances that arise after the complaint is filed:
 
 
 32
 Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often . . . for years. To abandon the case at an advanced stage may prove more wasteful than frugal. Friends of the Earth, 528 U.S. at 191-92.
 
 
 33
 We first consider whether Clark had standing to bring this lawsuit at the time he filed his complaint on June 19, 1998.
 
 A. Standing
 
 34
 Generally, in order to have standing and satisfy Article III's case or controversy requirement, a plaintiff must show he has suffered an injury in fact, that the injury is traceable to the challenged action of the defendant and that the injury can be redressed by a favorable decision. Id. at 180-81; Lujan, 504 U.S. at 560-61. A plaintiff must demonstrate standing for each form of relief he seeks. Friends of the Earth , 528 U.S. at 191-92. A determination that a plaintiff has standing to seek damages does not ensure that the plaintiff can also seek injunctive or declaratory relief. Id. (citing Los Angeles v. Lyons, 461 U.S. 95, 109 (1983)). Additionally, a plaintiff may have standing to challenge some provisions of a law, but not others. See 4805 Convoy, Inc. v. San Diego, 183 F.3d 1108, 1112-13 (9th Cir. 1999) (holding plaintiff had standing to challenge provisions regarding revocation and suspension of adult entertainment licenses but not the issuance of those licenses). We first address whether Clark has standing to seek various forms of relief. We then consider whether Clark has standing to challenge specific provisions of the Ordinance.
 
 1. Monetary Relief
 
 35
 Clark has standing to seek damages resulting from Lakewood's alleged unconstitutional Ordinance. Clark stated by declaration that in the two weeks prior to the effective date of the Ordinance his business grossed $3,814. In the two weeks after the Ordinance went into effect and he began complying with the new regulations, his business grossed only $1,725. This decrease in gross revenue, according to Clark, directly resulted from complying with the Ordinance's restrictions, causing Visions to operate at a daily loss.
 
 
 36
 In particular, Clark stated he had to reduce the seating area of his cabaret drastically to comply with the new distance regulations and had to hire additional employees to comply with the regulations limiting the job functions a single employee can undertake (e.g., under the Ordinance, a manager cannot also tend bar). Clark further stated that after the Ordinance went into effect, he had fewer customers and fewer entertainers who were willing to work for him under the new regulations. He attributed this to the decreased satisfaction of his customers who would prefer to have entertainers at a closer proximity than the Ordinance allows and their resulting unwillingness to tip entertainers as generously as before. According to Clark, the combined economic consequences of complying with the Ordinance forced him to close his business. Lakewood has not presented any evidence to dispute these statements and on summary judgment we view the evidence in the light most favorable to the nonmoving party. Therefore, for purposes of this appeal, we accept these statements as true.
 
 
 37
 We conclude that Clark's alleged financial loss is a sufficient injury in fact, that loss was caused by Lakewood's Ordinance and could be redressed by the payment of damages. See Young v. City of Simi Valley, 216 F.3d 807, 815 (9th Cir. 2000) (holding that economic loss suffered as a result of an adult zoning ordinance is a cognizable injury and is sufficient to satisfy the Article III standing requirement); see also Clinton v. City of New York, 524 U.S. 417, 432-33 (1998) ("The Court routinely recognizes . . . economic injury resulting from governmental actions . . . as sufficient to satisfy the Article III `injury in fact' requirement."). Although the financial impact of an adult entertainment regulation upon a plaintiff has only limited value in determining whether the regulation actually violates the First Amendment, see Spokane Arcade, Inc. v. City of Spokane, 75 F.3d 663, 666 (9th Cir. 1996), that impact is relevant and sufficient to satisfy Article III's injury-in-fact requirement and allow a plaintiff to proceed with his constitutional challenge to the regulation. We hold that Clark has standing to seek monetary relief.
 
 2. Injunctive and Declaratory Relief
 
 38
 "Article III standing requires an injury that is actual or imminent, not conjectural or hypothetical. In the context of injunctive relief, the plaintiff must demonstrate a real or immediate threat of an irreparable injury." Cole v. Oroville Union High Sch., 228 F.3d 1092, 1100 (9th Cir. 2000) (internal quotations and citations omitted). If a plaintiff has standing to seek injunctive relief, the plaintiff also has standing to seek a declaratory judgment. See Nashville, C. & St. L. Ry. v. Wallace, 288 U.S. 249, 261, 264 (1933) (holding that because the matter would have been justiciable as a request for an injunction, the suit for declaratory judgment was capable of federal adjudication).
 
 
 39
 Lakewood contends Clark lacks standing to seek prospective injunctive or declaratory relief because his business is closed and he is no longer being injured by the Ordinance. Clark responds that the Ordinance forced him to close his business because it imposed upon him unsustainable losses. Significantly, he states by declaration that if the Ordinance is declared unconstitutional, "it is my intent to reopen my business."
 
 
 40
 Clark's claim in essence is that at the time of filing this lawsuit, the Ordinance imposed operating restrictions preventing him from operating his business at a profit. Clearly, if the Ordinance had directly mandated that Clark close his business, he would have standing to request injunctive relief. The forced closing would be an injury in fact, that injury would have been caused by the Ordinance and an injunction stopping enforcement of the Ordinance would redress Clark's injury by allowing him to reopen. See Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 55 (1976) (stating federal jurisdiction was properly invoked where adult movie theaters requested injunctive relief from an ordinance that directly barred them from doing business in their current locations).
 
 
 41
 By the same reasoning, the Ordinance's indirect forced closing of Clark's business by allegedly rendering it unprofitable is also sufficient to give Clark standing to request an injunction. The claimed inability to operate his business (or continued daily losses if he reopened his business) is an injury in fact, that injury is caused by the Ordinance and an injunction stopping enforcement of the Ordinance would redress Clark's injury by allowing him to reopen his business free from the Ordinance's restrictions.
 
 
 42
 Clark's claimed injury is neither conjectural nor hypothetical. His prospect of reopening was realistic and credible. When he filed the lawsuit, Clark's business had been closed only about a month. He continued to hold all of the licenses he needed to operate an adult business under the old regime in Lakewood and he unequivocally stated he would go back into business if the Ordinance were enjoined. We hold this is sufficient to establish that Clark's threat of injury from the Ordinance was actual and imminent and that he has standing to request injunctive and declaratory relief.
 
 
 43
 3. Standing to Challenge Specific Provisions of the Ordinance
 
 
 44
 A plaintiff may have standing to challenge some provisions of a law but not others. See 4805 Convoy, 183 F.3d at 1112-13. Here, Lakewood argues that Clark lacks standing to challenge the licensing requirements for adult cabaret owners, managers and entertainers because those provisions have not caused injury to Clark.
 
 
 45
 a) Licensing of Adult Cabaret Owners
 
 
 46
 Clark challenges the Ordinance's requirement that each owner of a cabaret must be issued a license, LMC§§ 5.16.040, as an unconstitutional prior restraint. We agree with Lakewood that Clark lacks standing to challenge this provision because he cannot satisfy the injury-in-fact requirement. At the time he filed this lawsuit, Clark already had a license to operate an adult cabaret. Enjoining the new-license provision would therefore have had no effect upon Clark. If Clark was subject to any future threat of injury from Lakewood at that time, that threat would have arisen from the procedure for license renewals under LMC §§ 5.16.060. See 4805 Convoy, 183 F.3d at 1112 (holding plaintiff lacked standing to challenge adult cabaret licensing requirement where it already held a license, but had standing to challenge renewal provisions); DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 413-14 (6th Cir. 1997) (same). Clark, however, did not challenge the renewal provisions of the Ordinance as unconstitutional, so we need not address whether he would have had standing had he done so.
 
 
 47
 Clark correctly argues that his situation is distinguishable from Convoy because he has indicated his desire to move to another location and this would require him to seek a new license. There is, however, an additional barrier to Clark's seeking a new license. As Clark stated in his declaration, "There is a moratorium ordinance in effect in the City of Lakewood that prohibits the licensing of new adult uses in the City. But for that ordinance, I would be actively attempting to relocate my business." Clark, however, never challenged the moratorium in this, or as far as we can tell, any lawsuit. If, as Clark himself declares, the moratorium is the reason he did not apply for a new license, then the district court could not redress his alleged injury in this lawsuit. See Lujan, 504 U.S. at 561-62, 568-571. The moratorium is an intervening, unchallenged event that prevented the district court from granting Clark the relief he requested at the time he filed this suit.[6]
 
 
 48
 b) Licensing of Adult Cabaret Managers and Entertainers
 
 
 49
 Clark also challenges the Ordinance's licensing provisions for adult cabaret managers and entertainers, arguing the provisions are facially overbroad prior restraints. Clark alleges the licensing scheme here is facially unconstitutional because there is no requirement that a decision to issue or deny a license to a manger or entertainer be made within a brief, specified and reasonably prompt period of time, there is no stay from a decision upholding a license denial and there is no right to prompt judicial review and decision. Lakewood contends that Clark, the only plaintiff in this suit, does not have standing to bring claims based upon the third-party rights of his employees, none of whom has applied for or been denied a license. We disagree.
 
 
 50
 Under well-settled law, there is no doubt an adult cabaret manager or entertainer could facially challenge these regulations whether or not he or she had applied for and been denied a license. "[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 755-56 (1988); see also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969); Freedman v. Maryland, 380 U.S. 51, 56 (1965). A licensing scheme, adult or otherwise, can vest "unbridled discretion" in a decisionmaker where the scheme fails to place limits upon when a decision-maker must make a determination. To an unsuccessful license applicant, the unavoidable delay is tantamount to an effective denial of First Amendment rights. See FW/PBS, 493 U.S. at 224-25; 4805 Convoy, 183 F.3d at 111; Baby Tam, 154 F.3d at 1100.
 
 
 51
 We conclude the alleged defects in Lakewood's licensing scheme create a risk of delay that could unnecessarily foreclose expressive conduct and arbitrarily deny First Amendment rights. See FW/PBS, 493 U.S. at 226-27. Therefore, these provisions can be facially challenged without having to apply for and be denied a license.
 
 
 52
 The question, then, is whether Clark as the employer of actual or potential managers and entertainers -without whom he cannot operate his business -should have standing to challenge these provisions on behalf of his employees. The answer to this question invokes not only the Article III requirement of injury in fact, but also the prudential considerations that limit the challenges federal courts are willing to hear. See Sec'y of State v. Joseph H. Munson Co. , 467 U.S. 947, 955 (1984) (discussing prudential consideration that, generally, a plaintiff must assert his own legal rights). Under the overbreadth doctrine, these prudential considerations have weighed in favor of allowing litigants to bring First Amendment challenges on behalf of those whose expression might be impermissibly chilled, so long as the plaintiff also suffers an injury in fact. The Court in Munson explained:
 
 
 53
 Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. Id. at 956-57 (internal quotation omitted); see also 4805 Convoy, 183 F.3d at 1112 ("[A] plaintiff may challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals who are not before the court.").
 
 
 54
 An overbreadth challenge is appropriate here because there is a credible risk the Ordinance could cause self-censorship and chilling of expression. For example, instead of subjecting themselves to the alleged unconstitutional licensing scheme, managers and entertainers might choose to engage in their professions in other cities where their livelihood is not dependent upon the issuance and maintenance of a license. Managers might decide they cannot afford to wait 21 days before they can start working or that they cannot risk losing their job if the city revokes their license. Additionally, employees might be concerned about the Ordinance's requirement that they disclose their home address and phone number. Entertainers might be especially concerned about the risk that cabaret patrons could obtain such personal information and harass the entertainers at their homes, or worse. See LLEH, Inc. v. Wichita County, 121 F. Supp. 2d 513, 525 (N.D. Tex. 2000) (holding requirement that adult entertainment employees must disclose their home address and phone number is unconstitutional); N.W. Enters, Inc. v. City of Houston , 27 F. Supp. 2d 754, 840-41 (S.D. Tex. 1998) (same). For these reasons, there is a risk cabaret employees will engage in self-censorship and avoid participating in protected activity in Lakewood. We hold this is a sufficient basis to relax the prudential standing requirements and allow Clark to bring a facial overbreadth challenge to the licensing of managers and entertainers. See Munson, 467 U.S. at 956-57.
 
 
 55
 With that said, Clark still must meet the requirements for overbreadth standing: injury in fact and ability satisfactorily to frame the issues in the case. 4805 Convoy, 183 F.3d at 1112 (quoting Munson, 467 U.S. at 958); see Cole, 228 at 1099. In Munson, a professional for-profit fundraiser challenged a Maryland law that restricted charities' ability to use more than 25 percent of the money they raised to pay expenses. Munson, 467 U.S. at 950. The Court held that even though the fundraiser's own First Amendment rights were not at issue, it had standing to bring an overbreadth challenge on behalf of its client charities because it suffered a financial injury from the statute. Id. at 958.
 
 
 56
 Clark has stated a similar threat of specific future harm. Under the Ordinance, the owner of an adult cabaret cannot operate his business without having licensed employees present at all times. See LMC §§§§ 5.16.040(B), 5.16.050(C)(1). Therefore, if the City of Lakewood fails to license Clark's employees, Clark would be unable to resume his business and engage in expressive activity. As in Munson,"the activity sought to be protected is at the heart of [Appellant's] business . . . ." 467 U.S. at 958. Accordingly, Clark has established a constitutionally sufficient injury in fact.
 
 
 57
 Clark also satisfies the second overbreadth standing requirement: that he can satisfactorily frame the issues in the case. Clark has a vested interest in having the Ordinance overturned. If he is successful in his challenge to these provisions, he would be able to resume his once profitable business and might also be able to recover damages and attorney's fees. Additionally, Clark has been an aggressive advocate in this matter so far -in motion practice, discovery and on appeal -and has satisfactorily framed the issues in this case. In sum, Clark meets the standing requirements for bringing an overbreadth challenge to the manager and entertainer licensing provisions of the Ordinance.
 
 B. Mootness
 
 58
 Even though Clark had standing to bring this lawsuit when he filed his complaint in June 1998, circumstances have changed since then. We must therefore consider whether this action, or portions of it, are now moot. See Dittman v. California, 191 F.3d 1020, 1025 (9th Cir. 1999) (holding we have an independent obligation to address sua sponte whether a case is moot). " `[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " Pap's A.M., 529 U.S. at 287 (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)) (alterations in original).[7]
 
 
 59
 Clark's license to operate an adult cabaret expired on December 31, 1998, Clark not having sought renewal.[8] If he were to reopen his business as he intends to do, it appears he would have to apply for a new license. See LMC §§ 5.16.060(D). The concern is that because Clark no longer has a license to operate an adult cabaret, his future injuries are now too conjectural or hypothetical to satisfy the injury-in-fact requirement allowing him to pursue injunctive relief.
 
 
 60
 Although the expiration of Clark's license may make it more difficult for Clark to return to business, we conclude Clark still has a legally cognizable interest in the outcome of this lawsuit sufficient to allow him to seek injunctive relief. Clark's stated intention is to return to business. Assuming Clark would now have to apply for a new license and pay a fee as would any new adult cabaret owner, this added step is not an insurmountable barrier and thus not enough to moot Clark's case. See Pap's A.M., 529 U.S. at 287 (holding that "[s]imply closing [plaintiff's nude dancing establishment] is not sufficient to render the case moot, however. Pap's is still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie.").[9]
 
 II. Open Public Meetings Act ("OPMA")
 
 61
 Clark argues that because the Task Force that provided the evidentiary support for Ordinance 171 conducted its meetings in secret, the Ordinance resulting from the Task Force's work is "null and void," according to the terms of the OPMA. We agree that the OPMA applies to the Task Force and that the Task Force violated the OPMA by closing the majority of its meetings to the public. We conclude, however, that the remedy is not declaring the Ordinance null and void, but declaring the actions the Task Force conducted behind closed doors null and void.
 
 
 62
 The purpose of the OPMA is to ensure that public bodies make decisions openly. See RCW §§ 42.30.010; Miller v. City of Tacoma, 979 P.2d 429, 432 (Wash. 1999) (en banc). As stated in the statute:
 
 
 63
 The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.
 
 
 64
 RCW §§ 42.30.010. To meet the Act's purpose, courts applying its provisions are to construe it liberally. See RCW §§ 42.30.910 ("The purposes of this chapter are hereby declared remedial and shall be liberally construed."); Miller, 979 P.2d at 433. The driving provision of the Act states:
 
 
 65
 All meetings of a governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter.
 
 
 66
 RCW §§ 42.30.030.
 
 
 67
 To determine whether the Ordinance is valid under the OPMA, we must answer three questions: (1) Does the OPMA apply to the Task Force? (2) Did the Task Force violate the OPMA? (3) If the Task Force did violate the OPMA, is the remedy nullification of the Ordinance?
 
 
 68
 (1) Does the OPMA apply to the Task Force?
 
 
 69
 The requirement for open and public meetings applies only to governing bodies of public agencies. RCW §§ 42.30.030. We must determine whether the Task Force is a "governing body of a public agency."
 
 
 70
 "Public agency" is defined under RCW §§ 42.30.020(1) to mean (in relevant part):
 
 
 71
 (b) Any county, city, school district, special purpose district, or other municipal corporation or political subdivision of the state of Washington;
 
 
 72
 (c) Any subagency of a public agency which is created by or pursuant to statute, ordinance, or other legislative act, including but not limited to planning commissions, library or park boards, commissions, and agencies . . . .
 
 
 73
 "Governing body" is defined by RCW §§ 42.30.020(2) to mean:
 
 
 74
 the multimember board, commission, committee, council, or other policy or rule-making body of a public agency, or any committee thereof when the committee acts on behalf of the governing body, conducts hearings, or takes testimony or public comment.
 
 
 75
 Clearly, the City of Lakewood itself is a public agency as defined under §§ 42.30.020(1)(b) and the Planning Advisory Board is a public agency under §§ 42.30.020(1)(c) because it is a "planning commission." Under these definitions, the Lakewood City Council is a "governing body" of the City of Lakewood, because it is a "council" of the public agency of Lakewood. See §§ 42.30.020(2); Miller, 979 P.2d at 432 (applying OPMA to Tacoma's City Council). Under the broad definitions of the Act, the Planning Advisory Board is also a "governing body." The Board takes testimony and public comments on behalf of Lakewood and the City Council, as it did prior to passage of Ordinance 171. See §§ 42.30.020(2).
 
 
 76
 Based upon these predicates and the statute, we conclude that the Task Force is a "governing body of a public agency." The Task Force was created as a committee of the Planning Advisory Board (a "governing body") and it took testimony and public comments, conducted hearings and acted on behalf of the Board and the City Council (both "public agencies"). This places it squarely within the ambit of RCW §§ 42.30.020(2).
 
 
 77
 Lakewood disputes that the Task Force is a governing body, citing to Refai v. Central Washington University, 742 P.2d 137 (Wash. Ct. App. 1987). In Refai, the Washington Court of Appeals held that the faculty senate executive committee was not a governing body of Central Washington University. The Refai court, however, applied an older, narrower definition of governing bodies which limited governing bodies to those groups that make policy or rules. Id. at 144. Refai itself states that the faculty senate executive committee would probably have been considered a governing body under the then recently enacted new definition of governing bodies. See id. at 145 n.5. That new definition is the definition we apply today to conclude that Lakewood's Task Force is a governing body of a public agency.
 
 
 78
 2) Did the Task Force Violate the OPMA?
 
 
 79
 The evidence is undisputed that the Task Force violated the OPMA. The Act requires that all meetings of a governing body shall be open to the public. RCW §§ 42.30.030. The Task Force conducted at least 10 meetings, the majority of them closed to the public. These closed meetings violated the Act.
 
 
 80
 3) Does the Task Force's Violation of the OPMA Result in the Nullification of the Ordinance?
 
 
 81
 The third question we must answer is what consequences flow from the Task Force's violations of the OPMA. Clark would have us declare the entire Ordinance null and void, whereas Lakewood argues that because the ultimate ratification of the Ordinance was done in compliance with the Act, the Ordinance is valid. We agree that the Task Force's violations of the OPMA do not result in the Ordinance being declared null and void under the OPMA. We conclude, however, that the OPMA requires us to declare the Task Force's "actions" that were conducted in violation of the Act null and void.
 
 RCW §§ 42.30.060 states that:
 
 82
 No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken at meetings failing to comply with the provisions of this subsection shall be null and void.
 
 
 83
 "Action" is defined to mean:
 
 
 84
 the transaction of the official business of a public agency by a governing body including but not limited to receipt of public testimony, deliberations, discussions, considerations, reviews, evaluations, and final actions. "Final action" means a collective positive or negative decision, or an actual vote by a majority of the members of a governing body when sitting as a body or entity, upon a motion, proposal, resolution, order, or ordinance.
 
 
 85
 RCW §§ 42.30.020(3).
 
 
 86
 Under these provisions, any action taken in closed meetings is null and void. See Org. to Preserve Agric. Lands (OPAL) v. Adams County, 913 P.2d 793, 802 (Wash. 1996) (en banc). The statute, however, does not require that subsequent actions taken in compliance with the Act also be held null and void. Id.[10] In OPAL, two members of the County Commission discussed official business -the issuance of a permit -over the phone and not in an open meeting. Subsequently, the entire County Commission decided to issue the permit. The court held that any action taken on the phone was invalid, but the issuance of the permit was valid because it occurred in a public and open meeting. Id.
 
 
 87
 Here, whereas the majority of the Task Force's meetings leading up the Ordinance's passage were conducted behind closed doors, the City Council's actual passage of the Ordinance occurred at a public meeting on May 18, 1998. Therefore, the Ordinance is not null and void under the OPMA. Id. We conclude, however, that any actions taken at the Task Force's meetings that were closed to the public are null and void, thereby potentially undercutting the evidentiary foundation for the Ordinance, as we discuss in the next section below. Id. at 883. Accordingly, we reverse the district court's summary judgment in favor of Lakewood and denial of partial summary judgment in favor of Clark. As this is an appeal from a pretrial order, the record is not fully developed and we are unable to conclude what specific Task Force actions were conducted in open meetings and which were conducted in closed meetings. Upon remand, at trial or through other appropriate means, the district court will have to determine which actions are null and void and what effect, if any, that may have on the constitutionality of the Ordinance's provisions.
 
 III. First Amendment Challenges
 
 88
 As discussed earlier, a nude dancing regulation must meet the constitutional requirements of the O'Brien test. Pap's A.M., 529 U.S. at 289. We need not determine whether the Ordinance satisfies the first, third or fourth prongs of the O'Brien test, for even if it did, there is a material fact in dispute as to the second step in the analysis: whether the Ordinance furthers an important or substantial government interest.
 
 
 89
 Lakewood argues that the Ordinance furthers several significant government interests -protecting public health and safety and curtailing public sexual conduct and sexual crimes. These interests are indeed significant. Goehring v. Brophy, 94 F.3d 1294, 1300 (9th Cir. 1996); BSA, Inc. v. King County, 804 F.2d 1104, 1111 (9th Cir. 1986). The crucial question on which our decision turns, however, is whether these regulations further those significant interests.
 
 
 90
 We generally defer to a legislature's judgment on whether regulations advance a government interest. Alameda Books, 222 F.3d at 725. Additionally, cities do not necessarily have to conduct their own independent analyses regarding the effects of nude dancing, " `so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.' " Pap's A.M., 120 S.Ct. at 1395 (quoting Renton v. Playtime Theatres, Inc. , 475 U.S. 41, 51-52 (1986)).
 
 
 91
 In Alameda Books, this court struck down the City of Los Angeles' regulations concerning combined adult bookstores and video arcades. The Court concluded that the study the city relied upon to justify its regulations contained no findings regarding the secondary effects of combined bookstore/ arcades. Alameda Books, 222 F.3d at 725. Accordingly, we held it was not reasonable for the city to infer that, in the absence of regulations, a bookstore/arcade combination would have harmful secondary effects. Id.
 
 
 92
 Because the evidence the Lakewood City Council relied upon here may be null and void, there is a genuine issue of material fact regarding whether these regulations further a significant government interest. According to Lakewood's representative, the only evidence the City Council considered in passing the Ordinance was the Task Force's report and the adult entertainment owners' response to that report. The Task Force's report contains the background, findings and conclusions from the Task Force's analyses of the adult entertainment industry in Lakewood. Because the report and its foundation may be partly or entirely null and void under the OPMA, there may have been no valid evidentiary foundation to support the Ordinance's passage. If so, it is not reasonable to believe the Ordinance is relevant to the problems the city says it is addressing, and Lakewood may not have met its burden to justify its restrictions upon expression. Id. Although Lakewood might be able to rely upon other jurisdictions' experiences and studies to demonstrate that secondary effects pose a threat, see Pap's A.M., 529 U.S. at 296-97, the record indicates the City Council did not do this. Rather it relied solely upon the Task Force's report and comments to that report. Accordingly, we hold there is a genuine issue of material fact in dispute as to whether the Ordinance furthers a significant government interest. We therefore reverse the summary judgment in favor of Lakewood as to the constitutionality of the Ordinance.
 
 IV. Washington Constitution
 
 93
 Clark argues that the 21-day waiting period for managers to receive a license violates the Washington constitution because a decision to issue or deny a license is not made within a brief, specified and reasonably prompt period of time. For the sake of judicial economy, we address this claim now because this provision so clearly violates Washington law.[11] See Ino, Ino, Inc. v. City of Bellevue, 132 Wash. 2d 103, 123 (1997) (holding 14-day waiting period for managers violated Washington constitution). Lakewood modeled its provision on Bellevue's 14-day waiting period for managers and is nearly identical in every respect -except that the waiting period is even longer. Like Bellevue's law, "[t]he delay in issuing a manager's license suppresses future expression because the City permits nude dancing only if licensed managers are present. . . . Therefore, we hold that the City's failure to provide managers with temporary licenses during the [21]-day delay constitutes a prior restraint in violation of the Washington Constitution."[12] Id.
 
 CONCLUSION
 
 94
 For the foregoing reasons, we REVERSE the summary judgment in favor of Lakewood on all issues except as to Clark's standing to challenge the owner licensing requirement. On that issue we AFFIRM. We REVERSE the denial of summary judgment in favor of Clark as to whether the OPMA applies to the Task Force, whether the Task Force violated the OPMA and whether the 21-day waiting period for managers violates Washington law. Because there are material issues of fact in dispute, we AFFIRM the denial of partial summary judgment in favor of Clark in regard to the constitutionality of the Ordinance. We therefore REMAND for further proceedings consistent with this opinion. Each party to bear its own costs.
 
 
 95
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.[Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted][Tabular or Graphical Material Omitted]---------------
 
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior District Judge, United States District Court for the Northern District of California, sitting by designation.
 
 
 [1]
 Lakewood's representative stated at his deposition that the Task Force held 10 meetings whereas the preamble to the Ordinance states the Task Force held 11 meetings.
 
 
 [2]
 On February 28, 1996, the City of Lakewood placed a one-year moratorium upon the filing of any applications for new adult cabaret licenses. On January 21, 1997, the City Council extended the moratorium six months until August 28, 1997. Approximately every six months thereafter, upon the expiration of the moratorium, Lakewood extended the moratorium an additional six months. From our research, it appears Lakewood let the moratorium expire on February 28, 2001, and on February 5, 2001, passed Ordinance 258, which regulates the location of sexually oriented businesses.
 
 
 [3]
 In some of our decisions analyzing the constitutionality of nude dancing regulations, we have applied a variation of the test set forth in Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). See Alameda Books, 222 F.3d at 722; Colacurcio, 163 F.3d at 551. Under that test, "[m]unicipalities may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information." Alameda Books, 222 F.3d at 722 (quoting Colacurcio, 163 F.3d at 551) (alterations in the original). There is no substantive difference between these two tests, and a given result under one necessarily dictates an identical outcome under the other. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298 (1984) (comparing tests and concluding they are essentially identical). We will use the O'Brien test here because that is the test the Supreme Court has most recently held is applicable. Pap's A.M., 529 U.S. at 289.
 
 
 [4]
 The Supreme Court has not yet ruled on whether prompt judicial review requires a prompt judicial determination on the merits or only prompt access to court review. City News & Novelty, Inc. v. City of Waukesha, 121 S. Ct. 743, 746 (2001) (stating certiorari granted to resolve this issue but petition dismissed because the case was moot). We have held that there must be a prompt judicial determination. Baby Tam, 154 F.3d at 1100-01.
 
 
 [5]
 These two safeguards were first set forth by the Supreme Court in Freedman v. Maryland, 380 U.S. 51, 58-59 (1965). Freedman also set forth a third procedural safeguard that required the licensor to bear the burden of going to court and justifying a license denial. Id. at 59-60. Justice O'Connor's plurality opinion in FW/PBS, however, dispensed with the requirement in the context of business licensing schemes. FW/PBS, 493 U.S. at 229-30 (plurality).
 
 
 [6]
 We express no opinion as to whether Clark could amend his complaint or file a new lawsuit challenging the new-license requirement for owners now that his license and the moratorium have expired.
 
 
 [7]
 The phrases "legally cognizable interest" and "injury in fact" are for all practical purposes synonymous. See Sargeant v. Dixon, 130 F.3d 1067, 1069 (D.C. Cir. 1997) ("In order to have standing to sue in federal court, Article III of the Constitution of the United States requires that a complainant have suffered an injury in fact, which the Supreme Court has defined as the invasion of a concrete, imminent, and legally cognizable interest."). The phrase "legally cognizable interest" is often used to describe Article III's case or controversy requirements when mootness is at issue, while the phrase "injury in fact" is often used to discuss these requirements when standing is at issue. See, e.g., City News & Novelty, 121 S. Ct. at 747 (describing Article III's requirements in the context of mootness); Friends of the Earth, 528 U.S. at 180-85 (describing Article III's requirements in the context of standing).
 
 
 [8]
 From the expiration of Clark's license until at least February 28, 2001, Clark was not able to apply for a new license because Lakewood had a moratorium upon the issuance of adult cabaret licenses in effect. See supra note 2.
 
 
 [9]
 The Supreme Court's recent decision in City News & Novelty does not contradict this conclusion. City News, an adult bookstore, challenged the denial of its license renewal application. 121 S.Ct. at 746. Two months after the Supreme Court granted certiorari, City News withdrew its renewal application and closed its business because it felt it could not compete with a newly-opened, larger, more modern business. Waukesha argued that because it was undisputed that "City News neither now pursues nor currently expresses an intent to pursue a license under Waukesha law . . . the case has become moot, for City News no longer has a legally cognizable interest in the outcome." Id. at 746-47 (internal quotations omitted) (emphasis added). The Court agreed, reasoning that a closed business with no intent to reopen does not maintain a live controversy. Id. at 748. Here, Clark's stated intention to return to business if the Ordinance is declared unconstitutional sufficiently distinguishes Clark from the plaintiff in City News & Novelty.
 
 
 [10]
 There is a limited exception to this rule. If the decisions made in secret meetings are only formally ratified in a public setting, that formal ratification is null and void. See Miller, 979 P.2d at 435. In other words, if a city council met in secret and decided how it would vote and then held a public meeting in which it took a formal vote, that formal vote would be invalid. See id. This exception does not apply here because the Task Force did not, and could not, ratify the Ordinance.
 
 
 [11]
 See AAR Int'l Inc., v. Nimelias Enter. S.A., 250 F.3d 510, 523 (7th Cir. 2001) (holding appellate courts can address issues whose resolution is "beyond any doubt" in the interest of judicial economy); cf. Pope v. ManData, Inc, 209 F.3d 1161, 1164 (9th Cir. 2000).
 
 
 [12]
 In holding that this licensing provision offends the Washington Constitution, we do not preclude the possibility that it may also constitute a prior restraint in violation of the federal constitution. Cf. Baby Tam, 154 F.3d at 1100-01. However, we look first to state law to resolve this issue, in accordance with our longstanding principle that courts should avoid making federal constitutional decisions unless and until necessary. See San Remo Hotel v. City and County of San Francisco, 145 F.3d 1095, 1101 (9th Cir. 1998) ("If the constitutional question before us might be mooted or substantially narrowed by decision of the state law claims intertwined with the constitutional issues in this case, then our precedents require abstention in order to avoid an unnecessary conflict between state law and the federal Constitution.").